Filemon Garza GUTIERREZ; Ernesto Anzaldua Garcia; Nerea Anzaldua De Gomez; Arturo Garza Uribe; Beatriz Anzaldua De Garza; Maria Luisa Cavazos Garza; Delta Products Company, S.A.; Nocando Mem Holdings, Ltd.; and Javier Vasquez Castro, Individually and on behalf of all other similarly situated Plaintiffs, Appellants,

v.

The CAYMAN ISLANDS FIRM OF DELOITTE & TOUCHE; Deloitte & Touche Tohmatsu International; Michael Pilling; and Glen W. Wigney, Appellees.

No. 04–01–00637–CV.

Court of Appeals of Texas, San Antonio.

March 27, 2002.

Supplemental Opinion on Grant of Clarification and Overruling Rehearing Jan. 29, 2003.

Opinion Dissenting on Grant of Clarification and Overruling Rehearing Jan. 29, 2003.

Allan B. Diamond, Brian T. Burris, Sofia Adrogue, Diamond McCarthy Taylor & Finley, Houston, David Bryant, Dallas, F. Witcher McCullough, III, Michael S. Truesdale, William T. Reid, IV, Diamond McCarthy Taylor & Finley, Austin, Edward C. Snyder, Gerald T. Drought, Martin, Drought & Torres, Inc., San Antonio, for appellants.

Luther H. Soules, III, Paul D. Andrews, Soules & Wallace, P.C., San Antonio, Robb L. Voyles, Baker Botts, L.L.P., Austin, Alan R. Struble, Darren L. McCarty, M. Byron Wilder, Gibson, Dunn & Crutcher, L.L.P., Dallas, Ricardo G. Cedillo, Davis, Cedillo & Mendoza, Inc., San Antonio, William V. Dorsaneo, III, Dallas, for appellees.

Sitting: PHIL HARDBERGER, Chief Justice, CATHERINE STONE, Justice, and PAUL W. GREEN, Justice.

Opinion by: CATHERINE STONE, Justice.

This is an accelerated, interlocutory appeal of the trial court's order sustaining the special appearances of Deloitte Touche Tohmatsu International (DTT); the Cayman Islands Firm of Deloitte & Touche (DT–Cayman); and two DT–Cayman employees, Michael Pilling and Glen W. Wigney. We conclude that the trial court did not err in granting the special appearance of DTT; therefore, we affirm that portion of the trial court's judgment. However, because we conclude the trial court abused its discretion in ruling that it could not exercise personal jurisdiction over DT–Cayman and its employees, we reverse and remand that portion of the judgment.

### FACTUAL & PROCEDURAL BACKGROUND

Filemon Garza Gutierrez and the eight other named defendants (collectively, Gutierrez) represent a class of over 1,000 foreign investors—principally from Mexico and Latin America—who invested money through InverWorld Ltd., later known as I.G. Services Ltd. (collectively, Inver-World). InverWorld was a financial advice and investment firm organized under Caymanian laws but headquartered in San An-

tonio, Texas. Gutierrez's suit contends various Deloitte & Touche entities performed inadequate audits of InverWorld, thereby causing damages to InverWorld investors.

DTT is organized as a Swiss "verein" (loosely translated, a conglomerate), an international league of accounting firms, including DT–Cayman and Deloitte & Touche U.S.A., L.L.P. (DT–US). DTT considers each of its member firms to be an independent entity. Neither DTT nor DT–Cayman has offices, property, or employees in Texas. Glen Wigney and Michael Pilling, the individual employees of DT–Cayman, are Canadian citizens. DT–US has branch offices and employees throughout the United States, including in Texas.

InverWorld engaged DT–Cayman to serve as its independent accounting and auditing firm. The bulk of the auditing work was carried out in San Antonio by DT–US's Texas branch (DT–Texas), after which DT–Cayman resolved any questions, approved and formatted the report, and disseminated the final product. Although each audit DT–Cayman issued indicated InverWorld was financially sound, the company was actually grossly insolvent at the time later reports were issued. Gutierrez claims InverWorld was involved in an elaborate "Ponzi scheme."[1] After InverWorld collapsed, Gutierrez and his fellow investors lost over $325 million. Gutierrez filed a class action against DTT, DT–Cayman, and DT–Texas alleging causes of action for fraud, negligent misrepresentation, civil conspiracy, and violations of the Texas Securities Act. Currently, InverWorld is enmeshed in bankruptcy

proceedings in both the Cayman Islands and San Antonio, a receivership established in San Antonio, and Texas-based federal criminal prosecutions against two InverWorld partners.

DTT, DT–Cayman, and DT–Cayman's individually-named partners, Pilling and Wigney, filed a special appearance. During discovery, before the hearing on the special appearance, Gutierrez filed a motion to compel DT–Cayman to produce its practice manual. The trial court granted the motion and ordered DT–Cayman to produce its practice manual to Gutierrez. DT–Cayman filed a petition for writ of mandamus and a motion for emergency stay and temporary injunction to contest production of the manual. This court issued a conditional writ barring production of the manual. After a hearing, the trial court sustained the special appearance of DTT, DT–Cayman, and the individually named defendants. This interlocutory appeal ensued.

### GENERAL APPEARANCE

■ As a threshold issue presented for review, Gutierrez argues that DT–Cayman waived its special appearance when it filed its petition for writ of mandamus and motion for emergency relief without specifying that its appearance before the Fourth Court of Appeals was "subject to" the special appearance.

■ An objection to a Texas court's exercise of jurisdiction over a nonresident must be made by special appearance filed under Rule 120a of the Texas Rules of Civil Procedure. *See* TEX.R. CIV. P.

---

1. A "Ponzi scheme" is basically an investment fraud whose investors are enticed with the promise of extremely high returns or dividends over a very short period of time. Initial investors are paid exceptional dividends as interest from the deposits of a growing number of new investors. Profits to investors are not created by the success of the underlying business venture but instead are derived fraudulently from the capital contributions of other investors.

120a(2). Rule 120a "requires strict compliance." *Morris v. Morris,* 894 S.W.2d 859, 862 (Tex.App.-Fort Worth 1995, no writ). A special appearance must be made and determined on sworn motion prior to any other plea, pleading, or motion that seeks affirmative relief. TEX.R. CIV. P. 120a(1), (2); *Dawson–Austin v. Austin,* 968 S.W.2d 319, 323 (Tex.1998) (noting the test for a general appearance is whether party requests affirmative relief inconsistent with assertion that the district court lacks jurisdiction). Any appearance before judgment that is not in compliance with Rule 120a constitutes a general appearance. TEX.R. CIV. P. 120a(2); *Kawasaki Steel Corp. v. Middleton,* 699 S.W.2d 199, 201 (Tex.1985). A party contesting jurisdiction must not seek affirmative relief on any question other than that of the court's jurisdiction before the special appearance is determined. TEX.R. CIV. P. 120a(2) (providing that a special appearance "shall be heard and determined before ... any other plea or pleading may be heard"). Any intervening appearance to invoke the trial court's judgment about a "question other than the court's jurisdiction" is a general appearance. *Angelou v. African Overseas Union,* 33 S.W.3d 269, 275 (Tex.App.-Houston [14th Dist.] 2000, no pet.).

These limitations notwithstanding, the special appearance rule specifically provides:

> The issuance of process for witnesses, the taking of depositions, the serving of requests for admissions, and the use of discovery processes, shall not constitute a waiver of such special appearance.

TEX.R. CIV. P. 120a(1). DT–Cayman argues it did not waive its special appearance because (1) the petition and motion were not "pleadings;" (2) an original proceeding is a formally independent matter; and (3) Rule 120a specifies that the use of discovery processes does not constitute waiver. We agree.

First, this court distinguished a "pleading" from an "application" by defining a pleading as a means to allege a cause of action or ground of defense. *See In re L.A.M. & Assocs.,* 975 S.W.2d 80, 84 (Tex. App.-San Antonio 1998, orig. proceeding). Given that definition, DT–Cayman's petition and motion are not "pleadings" because neither a cause of action nor a ground of defense is alleged in either document. Second, jurisdiction of the various trial courts and appellate courts is independently conferred by law. *See, e.g.,* TEX. GOV'T CODE ANN. § 22.220 (Vernon 1988) (defining scope of appellate court's civil jurisdiction). Therefore, we decline to hold that a party's appearance before an appellate court constitutes a general appearance before the trial court. Third, we consider the use of mandamus proceedings to challenge discovery orders a "use of discovery processes" envisioned by Rule 120a.

This court has held that Rule 120a specifically contemplates ongoing discovery by the party challenging jurisdiction, and that nothing in the rule limits discovery to matters relating to the special appearance. *Case v. Grammar,* 31 S.W.3d 304, 311 (Tex.App.-San Antonio 2000, no pet.). Under similar circumstances, the El Paso court rejected the argument that objections to discovery requests equated a general appearance and noted, "We do not believe the rule's intent is to force a defendant to choose between waiving valid discovery objections or waiving its jurisdictional challenge." *See Moore v. Elektro–Mobil Technik GmbH,* 874 S.W.2d 324, 328 (Tex.App.-El Paso 1994, writ denied). That reasoning is equally applicable here. The only means a party has to challenge an order compelling production of alleged-

ly privileged matters is by seeking mandamus relief.

Accordingly, we hold DT–Cayman did not waive its special appearance. We overrule issue one.

## PERSONAL JURISDICTION

In issues two and three, Gutierrez challenges the trial court's ruling sustaining DT–Cayman's special appearances, contending (1) the contacts with Texas were sufficient; and (2) jurisdiction over a Texas agent of a foreign principal should be attributable to the principal. In issue four, Gutierrez challenges the trial court's ruling sustaining DTT's special appearance because he alleges DTT has a worldwide presence and acted as a "conduit" for activities in Texas.

### Standard of Review

■■■ On interlocutory appeal, we review the trial court's grant or denial of a special appearance for an abuse of discretion. *Eakin v. Acosta,* 21 S.W.3d 405, 408 (Tex.App.-San Antonio 2000, no pet.). We review the trial court's legal conclusions de novo, and we will not disturb those legal conclusions absent a showing of misapplication of the law. *Id.* A clear failure by the trial court to analyze or apply the law to the facts correctly will constitute an abuse of discretion. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992).

### Special Appearance

■■■ A nonresident defendant must negate all bases of personal jurisdiction to prevail in a special appearance. *See CSR Ltd. v. Link,* 925 S.W.2d 591, 596 (Tex. 1996). A Texas court may exercise jurisdiction over a non-resident if: (1) the Texas long-arm statute authorizes the exercise of jurisdiction; and (2) the exercise of jurisdiction comports with the state and federal constitutional guarantees of due process. *Guardian Royal Exch. Assur-*

*ance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991). The Texas long-arm statute authorizes the exercise of jurisdiction over nonresident defendants "doing business" in Texas. TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (Vernon 1997). The "broad language" of the long-arm statute permits an expansive reach limited only by federal constitutional requirements of due process. *Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex.1990).

■■■ Under the federal constitutional test of due process, a state may assert personal jurisdiction over a nonresident defendant if: (1) the defendant has purposefully established minimum contacts with the forum state; and (2) the exercise of jurisdiction comports with fair play and substantial justice. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *National Indus. Sand Ass'n v. Gibson,* 897 S.W.2d 769, 772 (Tex.1995). The presence of sufficient minimum contacts may support either general or specific jurisdiction. *Guardian Royal,* 815 S.W.2d at 227–28. General jurisdiction is present when a defendant's contacts are continuous and systematic. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Establishing general jurisdiction requires a more demanding minimum contacts analysis than is required to establish specific jurisdiction. *Schlobohm,* 784 S.W.2d at 357. Here, the parties agree that only specific jurisdiction is applicable.

## SPECIFIC JURISDICTION

■■■ Specific jurisdiction may be asserted if the cause of action arises out of or relates to the nonresident defendant's contact with the forum state. *Helicopteros,* 466 U.S. at 414, 104 S.Ct. 1868. The contact between the defendant and the

forum state must have occurred as a result of the defendant's purposeful conduct, and not because of the plaintiff's unilateral activity. *Id.* at 417, 104 S.Ct. 1868. For a Texas court to assert specific jurisdiction, (1) the nonresident defendant must purposefully do some act or consummate some transaction in the forum state; (2) the cause of action must arise from, or relate to, the act or transaction; and (3) the assertion of jurisdiction must not offend traditional notions of fair play and substantial justice, considering the quality, nature, and extent of the activity, the relative convenience of the parties, the benefits and protection of the laws of Texas afforded the parties, and the basic equities of the situation. *Schlobohm,* 784 S.W.2d at 358. Texas courts exercise specific jurisdiction over a defendant if the defendant's activities in Texas are isolated or disjointed, but the cause of action arises from those activities. *Id.* at 357, 784 S.W.2d 355; *Zac Smith & Co. v. Otis Elevator Co.,* 734 S.W.2d 662, 663 (Tex.1987). Accordingly, we must consider whether it is consistent with federal constitutional requirements of due process and with these enumerated Texas standards for the trial court to exercise specific jurisdiction over the Deloitte & Touche entities and their named employees.

### Minimum Contacts

■ When specific jurisdiction is asserted, the minimum contacts analysis focuses on the relationship between the nonresident defendant, the forum, and the litigation. *See Guardian Royal,* 815 S.W.2d at 228. The minimum contacts requirement is satisfied only if the cause of action arises from or relates to the nonresident defendant's contact with the forum state. *See CSR Ltd.,* 925 S.W.2d at 595. In other words, the nonresident defendant's activities must have been "purposefully directed" toward the forum, and the

litigation must result from alleged injuries that arise from or relate to those activities. *See Burger King,* 471 U.S. at 472, 105 S.Ct. 2174. This requirement that a defendant purposefully avail himself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws, ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person. *See id.* at 475, 105 S.Ct. 2174.

Thus, we focus on DTT and DT–Cayman's intentional activities and expectations in deciding whether it is proper to call them before a Texas court. *See World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291–92, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). We must determine whether DTT or DT–Cayman purposefully availed itself of the privilege of conducting activities within the state, thereby receiving the benefit and protection of Texas laws and whether its activities were substantial enough to justify a conclusion that DTT or DT–Cayman could have reasonably anticipated being called into a Texas court. *See Burger King,* 471 U.S. at 474–75, 105 S.Ct. 2174.

### DTT & DT–Cayman's Intentional Activities

The parties do not disagree about the facts, merely the interpretation of these facts and whether, taken together, these actions comprise the requisite showing of minimum contacts. The record reflects the following:

- Over a five-year period, DT–Cayman annually signed an Engagement Letter agreeing to audit InverWorld, whose offices, books, records, and computers were all located in San Antonio. The engagement letters were substantially the same from year to year; the lan-

guage in a representative letter in 1998 specifies, "We are pleased to serve as independent accountants and auditors.... Mr. Michel Pilling will be the audit engagement partner in the Cayman Islands. Mr. John Harrell, audit partner in the Houston office of our United States firm, will be primarily responsible for the services that we perform for the company."

● Each year, DT–Cayman signed a Liaison Agreement with DT–Texas, referring to it the responsibility of carrying out the bulk of the work involved in completing the audit and reserving for itself the ultimate responsibility for the audit; the liaison agreements were substantially the same from year to year; the language in a representative agreement in 1993 specifies, "[O]ur firm will act as the Participating Firm and your firm will act as the Referring Firm ... in respect to the audit [of InverWorld]."

● DT–Cayman asked for clarification when necessary, examined the audits carried out by DT–Texas, retained the right to grant final approval, and issued the final auditor's report each year.

● No employee of DT–Cayman ever came to Texas, but hundreds of letters, faxes, and phone calls were placed from DT–Cayman to DT–Texas and to Inver-World in San Antonio.

● DT–Cayman annually submitted to InverWorld a single, joint bill for its services and for those of DT–Texas.

● Each year, DT–Cayman mailed copies of the auditor's report to InverWorld shareholders in San Antonio, but did not send these to any of the InverWorld investors, including the plaintiffs; in the accompanying letter to the shareholders, DT–Cayman consistently used the words "we" and "our" to describe its work and opinions.

● In 1994, DT–Cayman sent 45 copies of the audited financial statements to In-verWorld shareholders in San Antonio, but sent approximately 50 copies of the statements to InverWorld in the Cayman Islands in the other years.

● DT–Texas agreed to indemnify DT–Cayman for any actions or claims that might arise from issuance of the audit, unless the cause of action resulted from the actions of DT–Cayman.

● DTT maintains a website in which it advertises itself as having "full service capacity in all regions of the world."

Gutierrez contends these facts establish minimum contacts by both DTT and DT–Cayman sufficient to establish specific jurisdiction.

### Specific Jurisdiction Over DTT

Gutierrez argues that an international firm that advertises it has "full service capacity in all regions of the world" is subject to Texas jurisdiction when it acts as a "conduit" for an audit. Based on the record before us, we cannot agree. Aside from maintaining a website and lending its name to multiple accounting firms, DTT had no relationship to the transactions in this case. It performed none of the work, had no interaction with InverWorld, and did not provide any services to DT–Texas or to DT–Cayman in connection with the InverWorld audit. Because DTT did not seek the benefits or protections of Texas laws, it could not reasonably anticipate being called into a Texas court. *See World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. 559.

We hold the trial court did not err in sustaining DTT's special appearance. We overrule issue four.

### Specific Jurisdiction Over DT–Cayman

Gutierrez advances alternate arguments in regard to jurisdiction over

DT–Cayman: (1) DT–Texas's acts should be attributable to DT–Cayman under agency principles; (2) DT–Cayman's contacts with Texas were sufficient because the contract between DT–Cayman and InverWorld called for performance in Texas. DT–Cayman responds that it negated all bases of specific jurisdiction, and that Gutierrez, because he produced no evidence that any of the plaintiffs read or relied on the audit reports, did not establish as a matter of law that the trial court had jurisdiction. *See M.G.M. Grand Hotel v. Castro,* 8 S.W.3d 403, 408 (Tex.App.-Corpus Christi 1999, no pet.) (holding the "ultimate burden" to establish jurisdiction rests with plaintiff after defendant produces credible evidence negating all bases of personal jurisdiction). Therefore, we must determine (1) whether there was an agency relationship between the two companies or (2) whether DT–Cayman "performed" in Texas, despite referring the bulk of the work to DT–Texas, when it used such terms as "we" and "our" in reference to the efforts of both entities. We must also address whether such considerations are relevant if there is no evidence the audits were received by or relied upon by Gutierrez.

### Agency

■ We cannot presume an agency relationship exists. *Johnson v. Owens,* 629 S.W.2d 873, 875 (Tex.App.-Fort Worth 1982, writ ref'd n.r.e.). An agency relationship may be found from underlying facts or direct and circumstantial evidence showing the relationship of the parties. *Elite Towing, Inc. v. LSI Fin. Group,* 985 S.W.2d 635, 643 (Tex.App.-Austin 1999, no pet.). An "agent" is one who is authorized by a person or entity to transact business or manage some affair for the person or entity. *Neeley v. Intercity Mgmt. Corp.,* 732 S.W.2d 644, 646 (Tex.App.-Corpus Christi 1987, no writ). An essential ele-

ment of the principal-agent relationship is the alleged principal's right to control the actions of the alleged agent. *Sendjar v. Gonzalez,* 520 S.W.2d 478, 481 (Tex.Civ. App.-San Antonio 1975, no writ). This right includes not only the right to assign tasks, but also the right to dictate the means and details of the process by which an agent will accomplish the task. *Johnson,* 629 S.W.2d at 875.

Based on the record before us, we agree no agency relationship existed between DT–Cayman and DT–Texas. The missing element is DT–Cayman's right to control DT–Texas's work. DT–Cayman's referral letter to DT–Texas provides only a single, basic direction: "Your general purpose examination of the financial statements of the above company should be conducted in accordance with auditing standards generally accepted in the United States." Thereafter, DT–Texas performed its work without direction from DT–Cayman. In short, there was not an agency relationship.

### Performance

■ The Texas Civil Practice and Remedies Code specifically provides that "doing business in Texas" occurs when a non-resident party "contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state." TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (Vernon 1997). A contract that is performable in Texas may provide a sufficient basis upon which to base personal jurisdiction. *See Zac Smith,* 734 S.W.2d at 665–66; *but see Magnolia Gas Co. v. Knight Equip. & Mfg. Corp.* 994 S.W.2d 684, 692 (Tex.App.-San Antonio 1998, no pet.) (noting partial performance of a contract in Texas is not the *sine qua non* of personal jurisdiction). The dispositive question is one of law: are the defendant's contacts of a sufficient nature and quality that the exercise of personal juris-

diction comports with fair play and substantial justice? *Magnolia Gas,* 994 S.W.2d at 692 (citing *Burger King,* 471 U.S. at 475–76, 105 S.Ct. 2174).

In arguing that DT–Cayman "performed" in Texas, Gutierrez relies principally on cases from our sister states. *See Reingold v. Deloitte Haskins & Sells,* 599 F.Supp. 1241, 1259 (S.D.N.Y.1984) (holding that because an Australian accounting firm knew an audit it issued would be used in the United States, it subjected itself to personal jurisdiction in New York); *Comm'r of Ins. v. Albino,* 225 Mich.App. 547, 572 N.W.2d 21, 27–28 (1997) (holding personal jurisdiction was warranted because Ernst & Young, over the course of several years, sent to Michigan its audits of a Canadian life insurance company doing business in Michigan); *First Am. Corp. v. Price Waterhouse LLP,* 988 F.Supp. 353, 363–64 (S.D.N.Y.1997) (concluding personal jurisdiction was established when one corporation did all the business the other corporation could have done had it been in New York itself).

To support its argument that the trial court did not err in sustaining its special appearance, DT–Cayman relies predominantly on Texas cases that reject personal jurisdiction even when a contract is partially performed in Texas. *See Eakin,* 21 S.W.3d at 407, 410–11 (no personal jurisdiction in Texas over attorney performing legal work for Texas resident); *Magnolia Gas,* 994 S.W.2d at 692 (holding no personal jurisdiction despite both parties' contemplation that some part of contract would be performed in Texas); *TeleVentures, Inc. v. Int'l Game Tech.,* 12 S.W.3d 900, 912 (Tex.App.-Austin 2000, pet. denied) (holding numerous communications with Texas insufficient for exercise of jurisdiction because no communication relied on by plaintiffs). In each of these cases, however, the most significant underlying

factor was the absence of activity purposefully directed toward the forum. *See Eakin,* 21 S.W.3d at 410 (noting all legal work actually performed in Florida, not Texas); *Magnolia Gas,* 994 S.W.2d at 692 (concluding Texas contacts entirely incidental, immaterial to purpose of contract, and not instigated by nonresident defendant); *TeleVentures,* 12 S.W.3d at 912 (holding record revealed much activity in Texas by plaintiff, but not nonresident defendant, and those contacts were incidental and immaterial). We cannot conclude that DT–Cayman's contacts with Texas were incidental, immaterial to the purpose of the contract between DT–Cayman and Inver-World, or instigated only by InverWorld.

We find *Cromer Finance Ltd. v. Berger,* 137 F.Supp.2d 452 (S.D.N.Y.2001) particularly instructive because its fact scenario closely resembles the facts before us. Investors in an off-shore investment firm managed in New York brought a securities fraud class action against the Deloitte & Touche Bermuda (DT–Bermuda) accounting firm that audited the investment firm. *Id.* at 460. As here, the plaintiffs in *Cromer* alleged that DT–Bermuda, DTT, and DT–US functioned as a unified, multinational accounting firm, and that DT–Bermuda signed engagement letters and relied heavily on its United States-based affiliates to perform the audit. *Id.* at 488–91. In response, DT–Bermuda made many of the same arguments DT–Cayman makes-it had no office, telephone number, employees, or mailing address in the United States; it rendered its services only in Bermuda; and it could not be subject to jurisdiction based on its relationship with the other Deloitte & Touche entities. *Id.* at 488–90. Because it was clear that DT–Bermuda knew it was serving a fund managed entirely in New York, the *Cromer* court held it would be hard pressed to argue its relationship with the United States was random, fortuitous, or attenuat-

ed. *Id.* at 491. Here, because DT–Cayman knew it was serving a firm managed entirely in San Antonio, it, too, would be hard pressed to argue its relationship with Texas was random, fortuitous, or attenuated. We hold that DT–Cayman's activities were purposefully directed toward Texas, and these activities constituted the requisite "minimum contacts" to establish specific jurisdiction. The pleadings allege that DT–Cayman's activities were carried out by Pilling and Wigney, and the record reflects their involvement in the audits. These specified acts support specific jurisdiction over Pilling and Wigney as well as DT–Cayman. *See Brown v. Gen. Brick Sales Co.,* 39 S.W.3d 291, 298–300 (Tex. App.-Fort Worth 2001, no pet.). We thus address next whether Gutierrez had to provide evidence of detrimental reliance on the audit reports to prevail.

DT–Cayman argues *Cromer* is distinguishable principally because the plaintiffs in *Cromer* actually relied to their detriment on the audits, and there is no proof here that any of the plaintiffs received an audit report, much less relied on it. The trial court determines a special appearance on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony. TEX.R. CIV. P. 120a(3). Although the pleadings state that the plaintiffs relied on the defendants' audits and reputation, and

that the plaintiffs were "induced by the rosy financial picture painted" to maintain and increase their investments, Gutierrez did not produce affidavits or depositions from any plaintiff, copies of any audit that had been in the possession of a plaintiff, or testimony from any plaintiff who received or relied on an audit. Gutierrez contends the absence of such evidence is irrelevant, and argues that DT–Cayman, like the auditors in *Reingold* and *Albino,* knew the audits it issued would be used in the United States. While there is no evidence the audits were used in Texas, we do not believe such evidence was required for the court to exercise jurisdiction over DT–Cayman.

■■■■■ Once a defendant has produced credible evidence negating all bases of personal jurisdiction, the plaintiff bears the ultimate burden to establish that the trial court has personal jurisdiction over the defendant as a matter of law. *See M.G.M. Grand Hotel,* 8 S.W.3d at 408. While DT–Cayman effectively *challenged* all bases of personal jurisdiction, we are not persuaded that it *negated* all bases. Although three of Gutierrez's causes of action—fraud, negligent misrepresentation, and violation of the Texas Securities Act—include reliance as an element that must be proved;[2] the fourth—civil conspiracy—does not.[3] More importantly, the word "reliance" does not appear in the language of the long-arm statute. To as-

---

2. Reliance is an element of fraud. *See Formosa Plastics Corp. USA v. Presidio Eng's and Contractors,* 960 S.W.2d 41, 47 (Tex.1998). Reliance is an element of negligent misrepresentation. *Larsen v. Carlene Langford & Assocs., Inc.,* 41 S.W.3d 245, 249 (Tex.App.-Waco 2001, pet. denied). Reliance is also an element of violations of the Texas Securities Act. *See* TEX.REV.CIV. STAT. ANN. art. 581–33F(2) (Vernon Supp.2002).

3. *See Massey v. Armco Steel Co.,* 652 S.W.2d 932, 934 (Tex.1983) (noting essential elements of civil conspiracy: (1) two or more persons; (2) with an object to be accomplished; (3) and with a meeting of the minds on the object or course of action; (4) commit one or more unlawful or overt acts; and (5) there are damages as a proximate result). Although the pleadings specify a claim for aiding & abetting/conversion rather than civil conspiracy, the facts alleged incorporate the elements of civil conspiracy.

sert specific jurisdiction, the cause of action must "arise from" or "relate to" the act or transaction. *Schlobohm,* 784 S.W.2d at 358. The audits unquestionably "relate to" Gutierrez's causes of action. Whether the plaintiffs relied on the audits is an element that must be proved at trial. We decline to impose on a plaintiff in a special appearance hearing the burden of proving the elements of liability, as opposed to showing the cause of action arose from or related to the nonresident's activities.

We consider the allegations in Gutierrez's pleadings, coupled with the minimum contacts enumerated above, sufficient to establish specific jurisdiction over DT–Cayman, Pilling, and Wigney.

### FAIR PLAY AND SUBSTANTIAL JUSTICE

Once it has been determined that the nonresident defendant purposefully established minimum contacts with the forum state, the contacts are evaluated in light of other factors to determine whether the assertion of personal jurisdiction comports with fair play and substantial justice. *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 113, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); *Burger King,* 471 U.S. at 476, 105 S.Ct. 2174. These factors include (1) the burden on the defendant, (2) the interests of the forum state in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several States in furthering fundamental substantive social policies. *World–Wide Volkswagen,* 444 U.S. at 292, 100 S.Ct. 559; *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174.

We also consider the quality, nature, and extent of the activity, the relative convenience of the parties, the benefits and protection of the laws of Texas afforded the parties, and the basic equities of the situation. *See Schlobohm,* 784 S.W.2d at 358. Even if the nonresident defendant has purposely established minimum contacts with the forum state, the exercise of jurisdiction may not be fair and reasonable under the facts in a particular case. *Burger King,* 471 U.S. at 477–78, 105 S.Ct. 2174. When the defendant is a resident of another nation, the court must also consider the procedural and substantive policies of other nations whose interests are affected by the assertion of jurisdiction by a state court. *Guardian Royal,* 815 S.W.2d at 228. It is incumbent upon a defendant to present "a compelling case that the presence of some consideration would render jurisdiction unreasonable." *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174; *see also Zac Smith & Co.,* 734 S.W.2d at 664.

### *The Burden on DT–Cayman*

Although not near to this state, the Cayman Islands are not so far from Texas as to render travel here unduly burdensome. It is a trip of hours, not days. DT–Cayman routinely does business with the United States, and thus is not utterly unfamiliar with our legal system.

### *Texas's Interest in Adjudicating the Dispute*

Texas has a strong interest in assuring the integrity of investment firms that choose to operate in the state, and we cannot permit this state to be used as a base of operations by corporations seeking shelter from our securities laws or from lawsuits.

### *Gutierrez's Interest in Obtaining Convenient and Effective Relief*

There are already bankruptcy, receivership, and criminal proceedings being conducted in San Antonio; thus, the plaintiffs have a strong interest in pursuing the

class action suit in a single forum. It is far more convenient to the plaintiffs to conduct the litigation here than to conduct it in the Cayman Islands because of these other proceedings, and less of a burden on them to travel to one forum.

### The Interstate Judicial System's Interest & The Shared Interests of the States

In an immediate sense, this suit has no impact on the interstate judicial system because the defendants and plaintiffs reside outside of the United States. Only InverWorld has its offices in San Antonio. However, because the regulation of securities firms has a national impact, exercising Texas jurisdiction would also conform to the decisions of other states when faced with similar jurisdictional questions.

Considering the quality, nature, and extent of the activities and the basic equities of the situation, it is reasonable to require a company that undertakes to audit a firm based in Texas to be haled into a Texas court if litigation arises. DT–Cayman has not presented a compelling case that the presence of some other consideration would render jurisdiction unreasonable.

We hold that the exercise of specific jurisdiction comports with fair play and substantial justice.

### CONCLUSION

We affirm that portion of the trial court's ruling in regard to the special appearance of DTT. We reverse that portion of the trial court's ruling in regard to the special appearances of DT–Cayman, Pilling, and Wigney, and remand the cause for further proceedings.

Sitting: PHIL HARDBERGER, Retired Chief Justice,[1] CATHERINE STONE, Justice, and PAUL W. GREEN, Justice.

### SUPPLEMENTAL CLARIFICATION OPINION

Although the panel disagrees regarding the appropriate disposition of the appellees' motion for rehearing, the panel agrees to grant the motion for clarification and to issue this opinion to correct the language in our prior opinion regarding reliance as an element of the appellants' causes of action. Our prior opinion stated:

> ... Although three of Gutierrez's causes of action—fraud, negligent misrepresentation, and violation of the Texas Securities Act—include reliance as an element that must be proved; the fourth—civil conspiracy—does not. . . .

*Gutierrez v. Deloitte & Touche,* 100 S.W.3d 261, 273 (Tex.App.-San Antonio 2002, no pet. h.) (footnotes omitted). The law is not clear whether reliance is an element of a cause of action based on a violation of the Texas Securities Act, and the statement made in the opinion is dicta. Accordingly, the panel withdraws the quoted sentence from our prior opinion and replaces it with the following:

> ... Reliance is not an element in all of the causes of action alleged by Gutierrez. . . .

PAUL W. GREEN, Justice, dissenting on motion for rehearing.

I dissent to the failure of the panel to grant rehearing to correct the panel's erroneous holding that DT–Cayman is subject to the jurisdiction of the Texas courts. Although I previously joined in the panel decision, I am now persuaded I was in error to conclude that DT–Cayman conducted any activities amounting to purposeful contacts in Texas that would subject it to jurisdiction in this State.

DT–Cayman, a Caymanian company, was hired by InverWorld, also a Caymani-

1. Retired Chief Justice Phil Hardberger not     participating.

an company, to serve as its independent accounting and auditing firm. In carrying out that assignment, DT–Cayman was required to engage DT–Texas to do the audit field work in Texas because InverWorld's principal office was located in San Antonio. That DT–Texas performed services for DT–Cayman in Texas is not sufficient to support Texas jurisdiction over DT–Cayman. *See Magnolia Gas v. Knight Equip. & Mfg. Corp.,* 994 S.W.2d 684, 692 (Tex. App.-San Antonio 1998, no pet.), *overruled on other grounds by BMC Software Belgium N.V. v. Marchand,* 83 S.W.3d 789 (Tex. 2002). Moreover, the record supports the trial court's implied finding that DT–Cayman's contacts with Texas were insufficient to establish the necessary minimum contacts to attach jurisdiction. I would affirm the trial court's order.