TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-02-00328-CV






Charles Walker, Appellant


v.


Robert Loiseau, Special Deputy Receiver for American Benefit Plans, et al., Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT

NO. GN201141, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N




 This is an appeal from the denial of a special appearance and the grant of a temporary
injunction. See Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7) (West Supp. 2003);Walling v.
Metcalfe, 863 S.W.2d 56, 58 (Tex. 1993). Appellant Charles Walker, a Mississippi resident and
president of First American Christian Society (1) ("the Fraternal"), conducted various business
transactions with Robert Neal, a Texas resident and president of American Benefit Plans ("American
Benefit"), regarding their respective insurance entities. In March 2002, the Attorney General of
Texas brought suit against American Benefit and other entities owned or controlled by Neal
(collectively the "Neal entities" (2)) for engaging in the unauthorized business of insurance in Texas. (3) 
The Attorney General did not name Walker as a defendant. The trial court established a receivership
to account for and recover American Benefit's various assets. (4) The Receiver then filed suit in Texas
against Walker, Neal, and other defendants, ancillary to the main receivership suit involving the Neal
entities, requesting a temporary injunction to freeze any assets held as a result of the Neal entities'
activities. Walker challenged the Texas court's personal jurisdiction over him with regard to
$500,000 transferred directly into his personal account. The district court denied Walker's special
appearance and granted the temporary injunction.


BACKGROUND


 In June 2001, Neal approached Walker with a proposal for the Fraternal to underwrite
an American Benefit health-insurance plan. The two men met in Mississippi, and on July 12 Walker
faxed a letter to Neal in Texas announcing an agreement whereby the Fraternal would serve as
underwriter and would issue a master insurance policy to American Benefit. However, later in July,
Walker faxed a second letter to Neal stating that any agreement between the two insurance entities
was "terminated, effective immediately." (5) Walker terminated the agreement because Neal had made
significant misrepresentations suggesting that the Fraternal insured all of American Benefit's health-care plans. (6)

 However, in October or November, Walker contacted Neal to express an interest in
marketing and selling American Benefit health-care plans in Mississippi. Walker signed in
Mississippi, and sent to Neal in Texas, a "General Agent Agreement," provided by Neal, by which
Walker agreed to market American Benefit plans in Mississippi. That contract included a choice-of-law and forum-selection clause providing that any disputes would be settled in Texas courts, under
Texas law. Although Walker testified that he never received a copy signed by Neal, he did make at
least one sale under the agreement, although the transaction does not appear to have been
consummated. During the same period, Walker and Neal negotiated to each buy a 25% share in
Capitol Re, a reinsurance company they intended to use to reinsure the American Benefit health
plans. That transaction also fell through.

 Walker then decided to sell his interest in the Fraternal. It is the alleged sale of the
Fraternal to Neal that forms the basis for the Receiver's suit against Walker to recover the $500,000. 
Walker faxed Neal indicating that he intended to sell his interest in the Fraternal and that, because
Neal had previously expressed a desire to purchase control of the Fraternal, Walker would delay
selling the company to another prospective buyer. The minutes from the Fraternal's January 10th
meeting indicated that Walker was considering two different buyers and would have to pray on the
decision. Minutes from the January 14th meeting indicate that Walker, acting alone, chose Neal. (7) 
In a subsequent fax, Walker indicated that he and Neal had reached an agreement on the sale:
"Congratulations on agreeing to purchase the Walker family investment and contributions into [the
Fraternal] and assuming control of [the Fraternal]." (8)

 Although the only documentation of the transaction consists of these fax
transmissions and the two excerpts from the minutes, Neal did in fact pay $500,000. Walker and his
family members resigned their positions on the board of the Fraternal, simultaneously appointing
Neal and his associates to constitute the new board of directors. (9) Neal caused two $250,000 wire
transfers to be sent by Electronic Benefits Group, a Neal entity, from a Texas bank to Walker's
personal account in Tupelo, Mississippi. At the time of this transfer, the Fraternal's value appears
from the record to have been significantly less than $500,000. The transfer was not memorialized,
at Neal's request, in order to avoid making the transaction generally known.

 In April, Walker received notice from the Mississippi Department of Insurance that
the Fraternal was in violation of various capitalization requirements under the Mississippi insurance
code and that the election of the new board had been illegal under a Mississippi law requiring that
directors of Mississippi fraternal benefit societies be Mississippi residents. After asking Neal and
the other newly installed board members to resign until they could establish Mississippi residence,
Walker assumed the position of acting president. Walker's brief to this Court indicates that he is
currently acting as president of the Fraternal.

 In March, before Walker received the letter from the Mississippi Department of
Insurance and while Neal was still in control of the Fraternal, the Texas Attorney General filed its
original action alleging that Neal had engaged in money laundering by diverting insurance proceeds
and premiums paid by Texas customers to various Neal entities. In that case, a forensic accountant
traced some of those funds to offshore accounts, including some that had passed through the
Fraternal. (10) Those funds allegedly passed from an entity known as the National Association for
Working Americans, through Electronic Benefits Group, both of which were Neal entities, and after
passing through the Fraternal were routed to offshore accounts on Neal's authority. (11)

 The Receiver filed this suit against Neal, Walker, and others seeking to recover any
funds wrongfully obtained from the Receivership estate. Initially, the Receiver pleaded the case
under a conversion theory, requesting restitution of the wrongfully-taken funds. While the other
defendants refused to testify, invoking their Fifth Amendment right against self-incrimination,
Walker chose to file a special appearance challenging the Texas courts' jurisdiction over his person. 
In his response to the special appearance, the Receiver adjusted his position to argue that Walker had
participated in tortious activities having an effect in Texas.


The Hearing

 Both Walker's special appearance and the temporary injunction were heard in the
same proceeding, without any prejudice to Walker's jurisdictional challenge. Walker did not appear. 
The Receiver based its argument for jurisdiction on the theory that Walker had participated in a
money-laundering scheme masterminded by Neal and affecting Texas consumers. The Receiver
began by taking the stand to testify about the underlying receivership proceedings and establish his
case that the $500,000 transfer was part of a larger illegal scheme. The Receiver then called Tom
Petrosewicz, a forensic accountant, to testify about the financial records of the Walker/Neal
transactions. Petrosewicz testified that Neal's practice of transferring money between insurance
entities without receiving equivalent value in exchange was consistent with a pattern of money-laundering activity. Petrosewicz confirmed that all of the money transferred, either to Walker or to
the Fraternal, had been taken from Texas insurance consumers. Despite close questioning by
Walker's counsel, Petrosewicz maintained his position that Walker had sold Neal a worthless
"interest" in the Fraternal in exchange for $500,000. The record contains no evidence t hat Walker
had actual knowledge that the $500,000 was the fruit of an illegal scheme operated by Neal. There
is also no evidence that the Fraternal was a link in Neal's alleged money laundering scheme while
Walker was its president or a board member.

 The Receiver introduced into evidence the various records of Walker's transactions
with Neal and the Mississippi Department of Insurance's letter declaring that the Fraternal would
be declared insolvent, absent remedial action, because it had included assets that did not belong to
it and had drastically understated its debts and liabilities. (12) The letter also indicated that the
mechanism by which Walker had transferred his interest to Neal, appointing the Neal family to sit
on the board of directors, violated the Fraternal's bylaws and the requirement that all directors be
Mississippi residents. (13) The Receiver argued that, because of this indication that the Fraternal had
not been worth the money Neal paid to Walker and because of the suggestion that the Fraternal was
legally incapable of benefitting Neal's insurance organization, Walker had participated in Neal's
tortious behavior.

 In response, Walker's counsel relied on Walker's deposition testimony explaining his
relationship with Neal. Walker argued that, because he could offer a plausible explanation for his
business transactions with Neal, it was impossible for the Texas courts to exercise jurisdiction based
only on the communications regarding the $500,000 in transferred funds. Walker argued that he had
merely sold his interest in the Fraternal to Neal in a bona fide transaction, taking place entirely in
Mississippi, and that any legal irregularities were the result of oversight on his part.

 Because Walker did not take the stand, the Receiver introduced and tendered all of
Walker's deposition into evidence. Walker had difficulty explaining the transaction. When asked
to describe the nature of the property he had conveyed to Neal in return for $500,000, Walker
claimed that he had transferred his and his family's "interest" in the Fraternal. However, under
questioning, Walker admitted that he did not actually own an interest in the Fraternal. Rather, the
Fraternal belongs to its members, not to the individuals managing the Fraternal's activities. Walker
freely admitted that he had no direct ownership interest in the Fraternal, but rather held a
"management contract" whereby he was to recover 5% of the Fraternal's profits. However, under
examination, Walker admitted that the Fraternal had never made a profit and that he had never been
paid any money pursuant to his management contract. Walker then suggested that he had transferred
to Neal a "controlling interest" in the Fraternal. However, Walker also admitted that he had
attempted to transfer control over the fraternal to Neal in contravention of the Fraternal's bylaws. 
Although under the by-laws only the membership may elect the board of directors, Walker and his
family attempted to transfer a controlling interest in the Fraternal by resigning and appointing a
successor board composed of Neal and his relatives. Walker further admitted that he knew it was
inappropriate for non-Mississippi residents to sit on the board of a Mississippi fraternal organization,
but maintained that he believed that the Neals intended to move to Mississippi and had looked into
buying real estate in the area.

 Walker claimed that the value of this management contract and control of the board
of directors was $500,000. This amount, Walker claimed, constituted the amount of money he had
personally invested in the Fraternal while acting as its manager. However, under examination,
Walker admitted that there existed no documentation of any debt owed by the Fraternal to Walker. 
Walker claimed that his wife, who served as the Fraternal's bookkeeper, knew of the investments
but had not entered them into the Fraternal's accounting records. Walker admitted that the required
capital disclosure forms, which were filed over his signature with the Mississippi Department of
Insurance, contained no record of the alleged $500,000 investment. Walker also contended that the
Fraternal had value to Neal because it provided an opportunity for Neal's insurance entities to sell
insurance products in other states, because Neal had been having some regulatory problems in
Texas. (14) Walker testified that Neal would be able to market insurance products outside of
Mississippi if Neal provided the Fraternal with sufficient capitalization to meet other states'
regulatory capitalization requirements. Although Walker offered no evidence supporting his
allegation that ownership of the Fraternal would assist Neal in marketing insurance products in
"other states," the letter from the Mississippi Department of Insurance indicates that "[the
Fraternal's] license only gives it the authority to offer certain benefits to Mississippi residents." (15)
(Emphasis added). Walker could give no other explanation for any value conveyed to Neal in return
for $500,000.

 Walker and the Receiver agreed on the basic details of Walker's business relationship
with Neal, but joined issue as to whether Walker had participated in Neal's money-laundering
activities. The Receiver contended that, because Walker's actions were part of a pattern of
fraudulent activity, undertaken in the context of an ongoing business relationship involving Texas
insurance entities, personal jurisdiction was appropriate based on the harm which occurred in Texas. 
Walker countered the Receiver's assertion of jurisdiction by attempting to provide an innocent
interpretation of each aspect of the purported sale of the Fraternal. The trial court denied Walker's
special appearance and granted the temporary injunction. Walker now appeals.


DISCUSSION


Special Appearance

 The plaintiff bears the initial burden of pleading sufficient allegations to bring a
nonresident defendant within the provisions of the Texas long-arm statute. See BMC Software
Belgium, N.V. v. Marchand, 83 S.W.3d 789, 793 (Tex. 2002). Once the plaintiff meets that burden,
the burden shifts to the defendant to negate all jurisdictional bases. Id.; Kawasaki Steel Corp. v.
Middleton, 699 S.W.2d 199, 203 (Tex. 1985). Whether a court has personal jurisdiction over a
defendant is a question of law. BMC Software, 83 S.W.3d at 794. However, the trial court
frequently must resolve questions of fact before deciding the jurisdictional question. Id.; see also
Pessina v. Rosson, 77 S.W.3d 293, 296 (Tex. App.--Austin 2001, pet. dism'd w.o.j.) (review of
special appearance on agreed facts: de novo). If a trial court enters an order denying a special
appearance and issues findings of fact and conclusions of law, the appellant may challenge the fact
findings on legal and factual sufficiency grounds. BMC Software, 83 S.W.3d at 794. We determine
the appropriateness of the trial court's resolution of a fact dispute by an ordinary sufficiency of the
evidence review based on the entire record of the special appearance proceeding. Daimler-Benz
Aktiengellschaft v. Olson, 21 S.W.3d 707, 715 (Tex. App.--Austin 2000, no pet.).

 A Texas court may exercise jurisdiction over a nonresident defendant if the Texas
long-arm statute authorizes the exercise of jurisdiction and the exercise of jurisdiction comports with
due process. Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C., 815 S.W.2d
223, 226 (Tex. 1991); see Tex. Civ. Prac. & Rem. Code Ann. § 17.042 (West 1997). The broad
language of the long-arm statute permits an expansive reach, limited only by the federal
constitutional requirements of due process. Schlobohm v. Schapiro, 784 S.W.2d 355, 357 (Tex.
1990). Therefore, our task is to determine whether the trial court's exercise of jurisdiction over
Walker violates federal due process standards. Guardian Royal, 815 S.W.2d at 226. The federal
due process clause protects a person's liberty interest in not being subject to binding judgments of
a forum with which that person is not sufficiently connected. See Burger King Corp. v. Rudzewicz,
471 U.S. 462, 471-72 (1985). A state may assert personal jurisdiction over a nonresident defendant
only if the defendant has (1) maintained minimum contacts with the forum state and (2) the exercise
of jurisdiction comports with traditional notions of fair play and substantial justice. BMC Software,
83 S.W.3d at 792. A nonresident defendant that has "purposefully availed" itself of the privileges
and benefits of conducting business in the foreign jurisdiction has sufficient contacts to confer
personal jurisdiction. Id. at 795 (citing Burger King, 471 U.S. at 474-76). Harmful activities that
will foreseeably cause harm in the foreign state are generally sufficient to invoke personal
jurisdiction. See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 296-97 (manufacturer
and importer subject to Oklahoma jurisdiction in automobile products-liability suit, but not New
York based importer and dealer). Furthermore, intentional tortious activity confers general
jurisdiction at the situs of the harm caused. Calder v. Jones, 465 U.S. 783, 789-90 (1984) (libel
jurisdiction appropriate in any state where libelous statements published).


Minimum Contacts

 Walker argues that specific personal jurisdiction is inappropriate in this case because
his legitimate business contacts with the State of Texas regarding the transferred money were
insufficient to constitute minimum contacts. (16) His argument, however, is based on case law
involving business transactions rather than patterns of tortious activity. See, e.g., 3-D Elec. Co. v.
Barnett Constr. Co., 706 S.W.2d 135, 137 (Tex. App.--Dallas 1986, writ ref'd) (Tennessee general
contractor not subject to jurisdiction based on casual contact with sub-contractor doing business in
Texas). The long-arm statute allows personal jurisdiction for any tort "committed in whole or in part
in Texas." Tex. Civ. Prac. & Rem. Code Ann. § 17.042(2). In Texas, personal jurisdiction may be
appropriate in cases where a defendant takes part in any aspect of a tortious scheme that impacts
Texas citizens, regardless of a defendant's other links to our State. See Siskind v. Villa Found. for
Educ., Inc., 642 S.W.2d 434, 437, 438 n.5 (Tex. 1982); see also Memorial Hosp. Sys. v. Fisher Ins.,
835 S.W.2d 645, 650-51 (Tex. App.--Houston [14th Dist.] 1992, no writ) (commission of tort
causing foreseeable economic injury in Texas sufficient to confer personal jurisdiction); General
Elec. v. Brown & Ross Int'l., 804 S.W.2d 527, 532 (Tex. App.--Houston [1st Dist.] 1990, writ
denied) (fraud conspirator subject to specific personal jurisdiction in Texas because, in participating
in fraud scheme, could have anticipated subsequent litigation). At the special appearance hearing,
the Receiver argued that personal jurisdiction was appropriate because Walker had participated in
Neal's scheme, much of which unfolded in Texas. See Tex. Civ. Prac. & Rem. Code Ann.
§ 17.042(2). Because participation in tortious activity is sufficient to confer specific personal
jurisdiction under both the long-arm statute and the federal due process clause, we will affirm the
trial court's ruling if the evidence presented at the hearing is legally and factually sufficient to
support the trial court's determination. See Olson, 21 S.W.3d at 715.

 When, as in this case, a trial court does not issue findings of fact and conclusions of
law with its special appearance ruling, all facts necessary to support the judgment and supported by
the evidence in the record are implied in favor of the denial. BMC Software, 83 S.W.3d at 795. 
Because the appellate record includes the reporter's and clerk's records, these implied findings are
not conclusive and may be challenged for legal and factual sufficiency. Id. In the case at bar,
however, the trial court's findings of fact pursuant to the temporary injunction, which were based
on the same record as the special appearance, are instructive in assessing the trial court's ruling on
the special appearance. The Receiver bore a higher burden in the temporary injunction proceeding;
an element of the pleadings for obtaining a temporary injunction is the requirement that the movant
demonstrate a right to probable recovery. Transport Co. of Tex. v. Robertson Transps., Inc., 261
S.W.2d 549, 552 (Tex. 1953); Amalgamated Acme Affiliates, Inc. v. Morton, 33 S.W.3d 387, 392
(Tex. App.--Austin 2000, no pet.). The trial court's finding indicates that the court considered there
to be sufficient evidence for the proposition that the Receiver would recover funds from Walker and
the other defendants because Walker and the others were participants in Neal's overall scheme. In
order to issue the temporary injunction, the trial court evaluated the credibility of Walker's testimony
before ruling against him. We believe that this finding bolsters the trial court's denial of Walker's
special appearance.

 We review the special appearance record under the same standard applied to the
review of jury findings or a trial court's findings of fact. See BMC Software, 82 S.W.3d at 795
(citing Roberson v. Robinson, 768 S.W.2d 280, 281 (Tex. 1989)). Walker bore the burden of
disproving all bases for jurisdiction. In its role as fact-finder, the trial court is the sole arbiter of the
witnesses' credibility and the weight to be given their testimony. See Bellefonte Underwriters Ins.
Co. v. Brown, 704 S.W.2d 742, 744-45 (Tex. 1986). It is not within the province of this Court to
interfere with the trial court's resolution of conflicts in the evidence or to pass on the weight or
credibility of the witnesses' testimony. See Benoit v. Wilson, 239 S.W.2d 792, 796 (Tex. 1951);
K-Mart Corp. v. Pearson, 818 S.W.2d 410, 413 (Tex. App.--Houston [1st Dist.] 1991, no writ).
Even when there is conflicting evidence, the fact-finder's verdict on such matters is generally
regarded as conclusive. See Schneider v. Schneider, 5 S.W.3d 925, 930 (Tex. App.--Austin 1999,
no pet.).

 The record contains sufficient evidence to suggest that Walker participated in a
scheme of tortious activity affecting Texas consumers. Petrosewicz described the overall modus
operandi of Neal's money-laundering activities: to transfer money between insurance entities
without any equivalent value being conferred or recorded in the accounting records. (17) Petrosewicz
testified that, as in the other instances of money transferring, the money transferred to Walker had
been given for little or no actual benefit. The "interest" in the Fraternal transferred to Neal by
Walker involved an almost insolvent fraternal benefit organization. There were no documents
memorializing the transaction. More importantly, the transfer was facially illegal because it involved
the selection by the former board of directors of a new board of directors and involved the transfer
of seats on a board of directors of a Mississippi fraternal benefits organization to non-Mississippi
residents, in contravention of state law. (18) Furthermore, the $500,000, which Walker characterized
as the value of his investment in the Fraternal, was not be accounted for in the Fraternal's accounting
records, which were kept by Walker's wife.

 The purpose of a special appearance is not to determine liability, but whether the
actions alleged by a plaintiff are of a type that suggest a defendant should expect to be subject to
Texas jurisdiction. See Mort Keshin & Co. v. Houston Chronicle Publ'g Co., 992 S.W.2d 642, 648
(Tex. App.--Houston [14th Dist.] 1999, no pet.). Walker's activities must also be evaluated in the
context of his business relationship with Neal, which makes clear that Walker understood that he was
dealing with money owned by Texas-based insurance entities. At one point, Walker even signed an
agency agreement with a forum-selection clause providing for Texas jurisdiction. These contacts
to some degree rebut Walker's assertion that he was unaware that his business dealings with Neal
could potentially make him amenable to personal jurisdiction in Texas. Taken together, the evidence
introduced by the Receiver was legally sufficient to support a finding that Walker had participated
in Neal's money-laundering activities and was therefore subject to personal jurisdiction in Texas. 
See Pessina, 77 S.W.3d at 296 (participation in fraudulent insurance scheme conferred personal
jurisdiction).

 To determine the factual sufficiency of the denial of the special appearance, we must
look to the record as a whole. The only direct evidence to contradict the Receiver's version of
Walker's transaction with Neal is Walker's deposition testimony, entered into evidence by the
Receiver. Walker claimed that he was an innocent seller in good faith and that any legal
irregularities involved in the sale were the result of his ignorance of the law. In essence, Walker's
deposition corroborates the details of the Receiver's version of events; Walker simply offers an
innocent explanation for each aspect of the transaction. The trier of fact was, in effect, presented
with two contradictory explanations of Walker's business relationship with Neal. As is apparent
from the denial of the special appearance and the finding that, for purposes of the temporary
injunction, all of the defendants had likely been participants in Neal's illegal schemes, the trial court
found Petrosewicz's explanation of the documentary evidence more credible than Walker's
explanation. (19) We will not disturb the trial court's determination of the credibility of equally relevant
testimony describing two theories of the case. See Gutierrez v. Deloitte & Touche, 100 S.W.3d 261,
273 (Tex. App.--San Antonio 2002, pet. filed) (specific jurisdiction appropriate in fraud case where
defendant presented testimony on, but did not negate, all jurisdictional bases).

 A nonresident defendant is subject to personal jurisdiction for activities that could
foreseeably cause injury in the forum state. The evidence is sufficient to support a finding that, in
all probability, Walker participated in a scheme that caused harm to Texas insurance consumers. 
Walker's participation in Neal's overall pattern of fraudulent activity satisfies the minimum-contacts
requirement of the required personal jurisdiction analysis.


Traditional Notions of Fair Play and Substantial Justice

 Even though minimum contacts are established, personal jurisdiction may still be
inappropriate if it violates traditional notions of fair play and substantial justice. Asahi Metal Indus.
Co. v. Superior Ct. of Cal., 480 U.S.102, 114 (1987); CSR Ltd. v. Link, 925 S.W.2d 591, 594 (Tex.
1996). The courts look to five factors in making this determination: (1) the burden on the defendant;
(2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining
convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most
efficient resolution of controversies; and (5) the shared interest of the several states in furthering
fundamental substantive social policies. Guardian Royal, 815 S.W.2d at 232.

 Walker has at no time proffered evidence of his inability to litigate fully and fairly
in Texas. In fact, the record indicates that Walker agreed to be, and was, deposed in Austin, Texas. 
Although there may be an argument that Walker would be inconvenienced by litigating this claim
in Texas based solely on geographic proximity, such concerns are greatly mitigated in this case by
the nature of the underlying suit and the need of the Receiver to maintain an efficient trial in order
to preserve the Receivership's assets. We are reluctant to hold that personal jurisdiction is
inappropriate simply because a defendant has been shown to be a resident of another state. Many
of the primary witnesses in this case, including the defendants in the underlying Receivership action,
are Texas residents. Furthermore, we believe that jurisdiction is appropriate in light of Texas's
overwhelming regulatory concern and the interest in efficient interstate enforcement of justice. 
Given the scope of the fraud allegedly perpetrated by the Neal entities, it would be wasteful of
judicial resources to conduct parallel litigation of this ancillary issue to the underlying Receivership
action in Mississippi. We overrule Walker's first issue.


Temporary Injunction

 Walker's only issue regarding the temporary injunction is his argument that the court
lacked personal jurisdiction. Because we find that the trial court properly denied Walker's special
appearance, we overrule his second issue.


CONCLUSION


 Because the evidence supports the implied finding that Walker participated in tortious
conduct having effects in Texas, we affirm the trial court's denial of Walker's special appearance
and the temporary injunction as entered.



 

 Mack Kidd, Justice

Before Justices Kidd, B. A. Smith and Yeakel 

Affirmed

Filed: July 24, 2003

1. First American Christian Society is referred to both as a "fraternal benefit society" and a
"burial association" in the record. Under Mississippi law, a fraternal benefit society may provide
a limited number of contractual benefits to its members, including: death, endowment, annuity,
disability, and hospital benefits. See Miss. Code Ann. §§ 83-29-1, 83-29-9, 83-30-31 (2003). We
will refer to First American Christian Society as "the Fraternal."
2. The entities for which Loiseau was appointed Special Deputy Receiver include: American
Benefit Plans; United Employers Voluntary Employee Beneficiary Association; United Employers
Voluntary Employee Beneficiary Association I; National Association for Working Americans;
National Association of Working Americans; Robert David Neal, individually and d/b/a American
Benefit Plans; United Employers Voluntary Employee Beneficiary Association; United Employers
Voluntary Employee Beneficiary Association I; National Association of Working Americans, and
National Association for Working Americans; and Robert Neal Pointer, individually and d/b/a
Electronic Benefits Group, Inc., and d/b/a American Benefit Plans d/b/a Electronic Benefits Group,
Inc.; Jose Michael Mangawang, individually and d/b/a National Association of/for Working
Americans, and d/b/a Enhanced Health Management and American Benefit Plans; John Baptist
Ramirez a/k/a Johnny Rhondo, individually, and The Four Corners Company, LLC, a/k/a Four
Corners Co., LLC, a/k/a Four Corners Corp., a/k/a The 4 Corners Company, LLC.; American
Association of Agriculture, Forestry and Fishing Workers; American Association of Transportation,
Communication, Electrical, Gas and Sanitary Workers; American Association of Wholesale Trade
Workers; American Association of Manufacturer Workers; American Association of Service
Workers; American Association of Construction Workers; and the American Association of
Professional Workers.
3. The Receiver prevailed in the underlying lawsuit. See Pointer v. State, No. 03-02-00548-CV, 2003 Tex. App. LEXIS4611 (Austin May 30, 2003, no pet. h.) (memorandum opinion). 
Although Neal was represented by counsel and filed a notice of appeal, he took no further action and
was dismissed as an appellant. See Pointer v. State, No. 03-02-00548-CV (Tex. App.--Austin
March 5, 2003) (order).
4. The Texas Department of Insurance was named Temporary Receiver for the defendants,
and Robert Loiseau was designated Special Deputy Receiver. We will refer to them collectively as
"the Receiver."
5. Much of Walker's correspondence is written in block capital letters. To make them more
readable, any citation will be made using sentence-style capitalization.
6. In his deposition, Walker described his discovery of Neal's misrepresentations: "[S]omeone
called me and said that, and I said it's not true. I said, we have been talking, but I said, nothing had
been signed." Walker then described his reaction: "I sent a letter, told [Neal] we was stopping all
negotiations. Because this [] guy that called me."
7. Other correspondence in the record suggests that there were other potential buyers, but that
record is underdeveloped and sketchy.
8. The cover sheet to Walker's fax directed Neal to sign the letter and fax it back to Walker;
there is no evidence in the record that Neal did so.
9. Minutes for the Fraternal's January 14 board meeting recorded the vote to appoint Neal
and others to the board. At this time, Walker and the current members resigned; however, each
would continue with their duties until Neal took control and responsibility. 
10. The record indicates that the offshore financial institutions that received the money alleged
to have been transferred through the Fraternal have agreed to return it to the Receiver.
11. According to Walker's deposition, he also had signature authority over the accounts in
question at the time of the offshore transfers.
12. In its letter, the Mississippi Department of Insurance indicated that the Fraternal had
misrepresented the value of its assets and the extent of its debts on its required capitalization filings.
13. Walker testified in his deposition that he believed that Neal and some of his family
members intended to relocate to Mississippi.
14. Walker admits that he ultimately learned that Neal had been indicted for his activities in
Texas, but claims that he only learned of the charges after his dealings with Neal had been
concluded.
15. We make no conclusion as to the ultimate legality of Walker's actions under Mississippi
law. The representations of the Mississippi Department of Insurance merely serve to rebut Walker's
position that he participated in a good faith transaction.
16. The minimum contacts analysis has been refined into two categories--general and specific. 
Specific jurisdiction exists when the cause of action arises out of or relates to the nonresident's
actions that give rise to the court's jurisdiction. Guardian Royal Exch. Assurance, Ltd. v. English
China Clays, P.L.C., 815 S.W.2d 223, 230 (Tex. 1991). General jurisdiction exists when the
defendant's contacts with the forum state are sufficiently continuous and systematic that there exists
personal jurisdiction for any suit against the defendant to be brought in that state. Id. Because
general jurisdiction has wider scope, the standard is more demanding, requiring a showing of
substantial activities within the forum state. Schlobohm v. Schapiro, 784 S.W.2d 355, 357 (Tex.
1990). The Receiver has not argued that Walker is subject to general jurisdiction.
17. Under Texas law, knowingly acquiring an interest in the proceeds of criminal activity may
constitute money laundering. See Tex. Pen. Code Ann. § 34.02(a)(1) (West 2003).
18. Walker in his deposition admitted that according to the Fraternal's by-laws the board of
directors could only be elected by a vote of the membership; nevertheless, Walker and his family
members attempted to appoint the new board without consulting the Fraternal's members.
19. By not testifying, Walker may have disadvantaged himself in the credibility contest.