In The


 

Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-04-449 CV


____________________



DELOITTE & TOUCHE NETHERLANDS ANTILLES AND ARUBA


AND DELOITTE TOUCHE TOHMATSU, Appellants



V.



HANS JURGEN GUSTAVO ULRICH, ET AL., Appellees






On Appeal from the 359th District Court


Montgomery County, Texas


Trial Cause No. 03-09-06413 CV






OPINION


 The issue in this interlocutory appeal is whether the trial court has personal
jurisdiction over two defendants. Fifty-four investors have sued various individuals, a
bank, an accountant, an accounting firm, and an international association of accounting
firms for wrongful conduct associated with an allegedly fraudulent securities scheme. The
investors assert various causes of action, including negligence, negligent misrepresentation,
aiding and abetting fraud, conspiracy, conversion, aiding and abetting violations of the
Texas Securities Act, and breach of fiduciary duty, against Deloitte & Touche Tohmatsu
(DTT), an association of accounting firms, and Deloitte Touche Netherlands Antilles and
Aruba (DTNA), an accounting firm. Plaintiffs' claims against DTNA and DTT concern
audits of Integra Bank. 

 DTNA and DTT challenged the Texas court's jurisdiction. The trial court denied
their special appearances, and DTNA and DTT filed this accelerated interlocutory appeal. 
See Tex. Civ. Prac. & Rem. Code Ann. 51.014(a)(7) (Vernon Supp. 2005). We affirm. 
Personal Jurisdiction


 The investors -- plaintiffs and intervenors in the trial court -- assert the trial court
has specific and general jurisdiction over DTT and specific jurisdiction over DTNA as a
result of business contacts in Texas. For specific jurisdiction over DTNA, plaintiffs point
to the following contacts: DTNA representatives' trips to The Woodlands, Texas, for
audit work relating to Integra Bank and other entities; regular communications and contacts
on matters essential to the audits with Integra Bank management and related entities in The
Woodlands, Texas; and communications and contacts with other Texas-based professionals
and companies on matters related to the Integra Bank audits. Plaintiffs allege DTNA and
DTT committed torts in Texas, and point out that the money plaintiffs lost in the allegedly
fraudulent scheme was held by and transferred through accounts in Texas. Plaintiffs also
assert that the Texas contacts of Deloitte and Touche entities should be attributed to DTT
under parent/subsidiary, alter ego, agency, and joint enterprise theories, and that DTT
itself has employees and an office in Texas. 

 The Texas long-arm statute provides for the exercise of jurisdiction over non-resident defendants. See Tex. Civ. Prac. & Rem. Code Ann. § 17.042 (Vernon 1997). 
The statute extends as far as the federal constitution permits. See generally Michiana Easy
Livin' Country, Inc. v. Holten, 48 Tex. Sup.Ct. J. 789, 2005 Tex. LEXIS 420, at *27, 42-43 (Tex. May 27, 2005). Therefore, courts focus on the federal constitutional due process
requirements for the exercise of personal jurisdiction. See Guardian Royal Exch.
Assurance, Ltd. v. English China Clays, P.L.C., 815 S.W.2d 223, 226 (Tex. 1991). 
Under the due process clause, jurisdiction is proper if a nonresident defendant has
"minimum contacts" with Texas, and maintenance of the lawsuit does not offend
"traditional notions of fair play and substantial justice." International Shoe Co. v.
Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945); American Type
Culture Collection, Inc. v. Coleman, 83 S.W.3d 801, 806 (Tex. 2002). The "minimum
contacts" analysis requires "'some act by which the defendant purposefully avails itself of
the privilege of conducting activities within the forum State, thus invoking the benefits and
protections of its laws.'" Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S.Ct.
2174, 85 L.Ed.2d 528 (1985) (quoting Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct.
1228, 2 L.Ed.2d 1283 (1958)). 

 The touchstone of the jurisdictional due process analysis is the "purposeful
availment" requirement. See Michiana, 2005 Tex. LEXIS 420, at *14. Due process
precludes a nonresident defendant from being haled into a jurisdiction solely on the basis 
of random, fortuitous, or attenuated contacts, or because of the unilateral activity of
another party or a third person. See Burger King, 471 U.S. at 475; American Type Culture
Collection, 83 S.W.3d at 806. Foreseeability is a factor to consider, but foreseeability
alone will not support personal jurisdiction. CSR Ltd. v. Link, 925 S.W.2d 591, 595 (Tex.
1996). The "'foreseeability that is critical to due process analysis . . . is that the
defendant's conduct and connection with the forum State are such that he should
reasonably anticipate being haled into court there.'" Burger King, 471 U.S. at 474
(quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559,
62 L.Ed.2d 490 (1980)). 

 Personal jurisdiction may be either general or specific. Schlobohm v. Schapiro, 784
S.W.2d 355, 357 (Tex. 1990). General jurisdiction requires that a defendant's purposeful
contacts in a forum state be continuous and systematic. See BMC Software Belgium, N.V.
v. Marchand, 83 S.W.3d 789, 796 (Tex. 2002). The contacts or activities must be
substantial such that the State is justified in exercising power over the nonresident as
though it were a resident; that is, in the general jurisdiction context, jurisdiction exists
even if the claim does not arise from or relate to the activities conducted within the State. 
Id.; see also CSR, 925 S.W.2d at 595. Specific jurisdiction over the defendant "is
established if the defendant's alleged liability arises from or is related to an activity
conducted within the forum." BMC, 83 S.W.3d at 796. 

 Whether the trial court has personal jurisdiction over a defendant is a question of
law. American Type Culture Collection, 83 S.W.3d at 805-06. In resolving this question
of law, a trial court must sometimes resolve questions of fact. Id. at 806. The focus
should be on the defendant's contacts with the State, rather than on the underlying merits
of the case. Michiana, 2005 Tex. LEXIS 420, at *33-35. An appellate court reviews a
jurisdictional determination de novo. American Type Culture Collection, 83 S.W.3d at
805-06. 

The InterAmericas Group


 Plaintiffs are Mexican citizens, residents, or business entities that invested in Integra
Bank. Integra Bank was incorporated as a Netherlands Antilles bank on July 26, 1990, and
engaged in international banking business. No one from Curacao, Netherlands Antilles,
held an account in the bank. Part of a group called InterAmericas, Integra Bank had most
of its money invested in loans. Plaintiffs invested in the InterAmericas Group and were
informed their accounts were managed by and through InterAmericas' personnel in The
Woodlands, Texas. 

 The InterAmericas is a group of domestic and offshore companies owned or
controlled by Hugo Pimienta, his family, and three other partners. Pimienta and the
partners in the "Group" also controlled and operated Integra Bank from The Woodlands
and made all major decisions regarding loans and investments for the bank. Although two
of Integra Bank's directors were located in the Netherlands Antilles, some, if not most, of
the business and accounting operations were conducted in The Woodlands. Investors'
funds were held in Integra Bank's name at banks in Texas.

 The "administrative operations" and "back office accounting" for Integra Bank 
were "out-sourced" to Texas companies, first IBI and later Gamma Capital Services, both
in Houston or The Woodlands. Both IBI and Gamma were companies in the InterAmericas
Group. Integra Bank's general ledger, source documentation (loan files, "bank
statements," payroll data of personnel), and internal controls were in Curacao. The trial
balances and subledgers were partially kept in Houston and partially in Curacao. Most,
if not all, of the administrative functions were conducted in Houston: the Bank's customer
statements were printed and sent out from Texas though the process was coordinated by
the local management in Curacao; the trial balance data originated in Texas and was sent
to Curacao from Texas; customer orders and transactions were processed in Houston;
confirmations for Integra Bank went directly from Houston to the customers; and
reconciliation of the various transactions was done in Houston. There is also evidence that
Jerry Simpson, the in-house accountant in Texas for the InterAmericas Group, used the
accounting support information generated in Texas to prepare the financial statements for
Integra Bank. Further, one of DTNA's auditors testified, "I don't know the exact
percentage but once the back office operations were being done in Houston, it's . . . only
logical that most of the accounting would be done there." 

DTNA and DTT


 DTNA, an accounting firm organized under the laws of the Netherlands Antilles,
has no offices, telephone numbers, mailing addresses, bank accounts, business agents,
taxpayer identification numbers, agents for service of process, real property, or personal
property in Texas. No partner or employee resides in Texas. With the exception of the
specific contacts with Texas in this case, DTNA does not solicit business or advertise in
Texas and has not entered into any contracts to perform services in Texas. 

 DTT, a Swiss verein, is described by DTT as a membership association composed
of individual accounting firms that conform to the verein requirements and use the
international Deloitte Touche practice name granted to the local firms by DTT. DTNA
is a member of the verein, as is Deloitte & Touche-U.S. Appellees assert DTT has
individual firm employees who are "seconded" to the verein and who do the verein's 
work in its office in Houston, Texas. DTT asserts it has no offices, "salaried" employees,
property, telephone numbers, mailing addresses, bank accounts, licenses to do business,
or agents for service of process in Texas, and does no "commercial" business in Texas. 
Instead, DTT borrows its Texas office and employees from a member firm and reimburses
the member firm its costs at the end of the year. 

 The Audits


 Over a three-year period from 1997-1999, DTNA contracted to audit Integra Bank. 
DTNA knew from the first meeting with Integra Bank's representatives in 1997 that the
majority of the bank's accounting records were not maintained in Curacao. DTNA
concedes this practice was a violation of the banking regulations in the Netherlands
Antilles. DTNA knew the firm would have to evaluate the organization of the bank's
Texas accounting. 

 Anthony Cijntje, a partner in DTNA, communicated with Integra Bank's Roberto
Canales regarding DTNA's acceptance of the audit responsibilities while Canales was in
Texas. DTNA representatives met with the "back office" personnel in The Woodlands.
While in The Woodlands, DTNA representatives conducted interviews with personnel at
Gamma Corporation regarding DTNA's evaluation of the accounting procedures being
done there by Gamma for Integra Bank. DTNA checked the customers' statements to
determine whether they had been shipped correctly; while in Texas, DTNA representatives
conducted and "checked out" the "confirmation" process. Cijntje, a DTNA partner,
testified the internal controls had to be tested both in Curacao and Houston to comply with
GAAP (Generally Accepted Accounting Principles), while Alvin Francisco, a DTNA
employee, said DTNA could rely on the report of the Texas service provider's auditor, and
a trip to Texas was unnecessary. Plaintiffs' accounting expert testified an on-site visit to
Texas would be necessary to observe the application of internal controls. Regardless, the
purpose of DTNA's trips to Houston was to see whether the "out-sourced" administrative
operations existed, how they functioned, and to what extent DTNA needed to take those
into account for its audit in Curacao. 

 DTNA --Specific Jurisdiction


 Plaintiffs rely on Gutierrez v. Cayman Islands Firm of Deloitte & Touche, an
accounting malpractice case, to support the trial court's finding of specific jurisdiction 
over DTNA. Gutierrez, 100 S.W.3d 261 (Tex. App.--San Antonio 2002, pet. dism'd). 
InverWorld, an investment firm organized under Cayman law but headquartered in San
Antonio, contracted with DT-Cayman to serve as InverWorld's independent accounting
and auditing firm for each of five years. Id. at 265-66. InverWorld maintained a place
of business in Texas, and the contract between InverWorld and DT-Cayman apparently
was made performable in Texas. Id. at 271. DT-Cayman had no offices, property, or
employees in Texas. Id. at 266. InverWorld's offices, books, records, and computers
were all located in San Antonio. Id. at 269. DT-Cayman engaged the Texas branch of
DT-US to perform the bulk of the auditing work in San Antonio. Id. at 266, 270. 
Although DT-Cayman never sent its employees to Texas, DT-Cayman asked for
clarification on the audit work when necessary, examined the audits carried out by DT-Texas, retained the right to grant final approval, and issued the final auditor's report each
year. Id. at 270. DT-Cayman placed hundreds of faxes and phone calls and wrote letters
to DT-Texas and InverWorld in San Antonio. Id. Based on these facts, the Gutierrez
court found DT-Cayman's activities were purposefully directed at Texas. Id. at 272-273. (1) 
The court explained that "because DT-Cayman knew it was serving a firm managed
entirely in San Antonio," DT-Cayman "would be hard pressed to argue its relationship
with Texas was random, fortuitous, or attenuated." Id. at 273.

 Like InverWorld, Integra Bank was organized under foreign law, and, like
InverWorld, Integra Bank contracted with a Deloitte Touche firm in the country of its
origin to perform audit work. In both instances, substantial portions of the work had to
be done in Texas. In Gutierrez, DT-Cayman contracted with the Texas branch of Deloitte
Touche-U.S. to do audit work at InverWorld's San Antonio headquarters; DT-Cayman did
not send any employees to Texas to handle that audit work. Id., at 266, 270. Integra
Bank was not headquartered in Texas, but the record reveals administrative and accounting
functions for the bank were handled in Texas by other companies in the InterAmericas
Group. The trial court reasonably could have concluded from the evidence presented that
a significant part of the Group's primary operations, including those of Integra Bank, were
centered in Texas. Integra Bank engaged DTNA to do the bank's audits for 1997, 1998,
and 1999. Unlike DT-Cayman in Gutierrez, DTNA did not contract with DT-U.S. to do
the Texas portion of Integra's audit. Instead, DTNA sent one of its partners, along with
other senior DTNA accountants, to Texas to personally handle that portion of the work
here. 

 The issue presented is whether DTNA purposefully availed itself of the benefits of
doing business in Texas, or whether, as DTNA argues, the Texas business contacts are the
result of the unilateral activity by a third party and fortuitous. DTNA admits it knew from
the time it accepted the audit assignment that a major part of the accounting for Integra
Bank was done in Texas in violation of applicable banking regulations in the Netherlands
Antilles. DTNA representatives came to Texas to evaluate the accounting functions being
done in Texas. A DTNA representative communicated with a key Integra Bank official
in The Woodlands. The other companies doing the accounting for the bank were also
members of the Group, and DTNA representatives met with representatives of IBI (a
Group member and one of the companies providing the accounting in Texas for Integra
Bank) regarding the audit. Integra Bank was controlled by Group partners in The
Woodlands. It is undisputed that DTNA expected to profit from its activities in Texas and
received a benefit from that work as part of its audit of Integra Bank. On this record, the
trial court reasonably could have concluded DTNA purposefully availed itself of the
privileges of conducting those specific business activities in Texas, thus invoking the
benefits and protections of the laws of Texas. DTNA could reasonably have anticipated
that a Texas court would have jurisdiction over DTNA to govern DTNA's conduct arising
specifically out of its work in Texas for a bank that centered many of its activities in
Texas. 

 The pleadings and evidence show plaintiffs' causes of action arise from DTNA's
specific business contacts with Texas. Plaintiffs claim the defendants were negligent in
performing the audit work, in determining that a control-based audit was sufficient for
Integra Bank's audit, and that use of this audit approach was part of the effort to further
the defendants' fraudulent securities scheme against the investors. There is evidence in
the record that DTNA's decision to perform a control-based audit of Integra Bank, and
therefore the audit itself, relied on work performed by DTNA in Texas. Plaintiffs
maintain that had defendants conducted their audits in accordance with GAAP and GAAS (2)
standards, the audits would have revealed the true status of Integra Bank's financial and
operating condition, and plaintiffs would never have invested their money with the Group,
or they would have withdrawn their funds and invested elsewhere. Affidavits by the
plaintiffs attest to their reliance on the audits. We do not address the merits of plaintiffs'
claims. We hold only that DTNA's business contacts with Texas support specific
jurisdiction over DTNA on the specific claims arising out of those activities conducted in
Texas. 

DTT - General Jurisdiction 
 

 Plaintiffs maintain the trial court has general and specific jurisdiction over DTT. 
We address only the general jurisdiction question because it is dispositive. 

 DTT is a "verein" headquartered in Zurich, Switzerland. The verein has individual
accounting firm members, such as DTNA and DT-US, that pay the verein a small
percentage of net revenues as a "subscription fee" which, in turn, funds the verein's global
operations. The DTT verein has a board comprised mainly of the managing partners of
the member firms. The verein owns the name "Deloitte & Touche" and lends that name
through a license agreement to individual firms such as DTNA and DT-US. Assigned a
specific territory, the individual firms use the "brand" name on their business cards,
correspondence, and work product. All of the member firms manage themselves locally. 
DTT does not provide any audit, tax, or consulting services to the individual firms' clients. 
 The verein's goals include, among others, adherence by member firms to the highest
professional standards; the fostering of international alignment, cooperation, and cohesion
among the member firms; and advancement of international and national leadership of the
member firms in rendering professional services. Every year the individual firm goes
through a strategic planning process to confirm the firm's training is aligned with
requirements of the law. Regional managing partners go to the local firms, review and
comment on the firms' plans, and ultimately report back to the firms on the adequacy of
those plans. 

 Plaintiffs' pleadings assert the Texas district court has general jurisdiction over
DTT, in part because DTT has an office in Texas and has continuously and systematically
conducted business in the State. DTT maintains it does not have offices, salaried
employees, property, telephone numbers, mailing addresses, bank accounts, licenses to do
business, agents for services of process, or taxpayer identification numbers in Texas. DTT
says it has not conducted any "commercial business" in Texas. In fact, a DTT
representative stated, "DTT has no clients and it has no employees. It has no presence in
the U.S." Rather than engaging in what it calls "commercial business," DTT asserts it
"provides services only to its member firms." 

 DTT's corporate representative, Ben Anderson, testified he is a partner in the
Deloitte & Touche U.S. firm (Deloitte & Touche LLP). Anderson explained that the cost
of his office is paid for by DTT; at the end of the year, DTT reimburses the U.S. firm
both for his office space and his time. He explained:

 I have been completely seconded to Deloitte & Touche Tohmatsu [DTT]. 
I am 100 percent seconded to [DTT], which means that my duties in the
U.S. firm are next to nothing. At the end of the year [DTT] then reimburses
the U.S. firm for my partnership earnings.

As used here, "seconded" means the loaning of an employee by an employer to another
to perform work on behalf of the second employer. Under Texas law, a general or regular
employee of one employer may become the borrowed employee of another. St. Joseph
Hosp. v. Wolff, 94 S.W.3d 513, 537 (Tex. 2002). If the other employer has the right to
direct and control the details of the particular work, the person becomes the employee of
the other. Id.

 Anderson's office is in Houston, and he has been 100% seconded or loaned there
to DTT for over ten years. (3) He reports to another partner who in turn reports to the CEO
of DTT. In the same Houston office, there are three other Deloitte U.S. employees who
are also seconded to DTT. 

 Anderson works from his Houston, Texas, office as "managing partner of the Latin
American region" and advises those regional member firms "on the development of their
tax practices in their respective countries." A large part of his responsibility at DTT is to
"help the member firms grow by targeting, marketing, sales, growth . . . . That's how
the verein will grow, by growing the members firms." Anderson goes to the individual
firms, reviews and comments on their plans, and evaluates the adequacy of those plans. 
His other function is to "develop learning modules on tax issues for the benefit of member
firms around the world." Julie Marshall is another Deloitte U.S. employee seconded to
DTT in Houston. From the Houston office, Marshall, as "learning director for Latin
America," organizes, coordinates, and facilitates the training for member firms of the
Latin American region. In performing their functions for DTT, both Anderson and
Marshall help to advance the stated purposes of the verein. 

 DTT argues it has no continuous and systematic business contacts with Texas
because, among other things, it has no "salaried employees" in Texas, and the seconded
people in Texas do not engage in work to develop Texas business or exploit Texas
markets. However, under Texas law the seconded personnel in Texas are considered DTT
employees, and their work is DTT work ultimately paid for and controlled by DTT. See
generally St. Joseph Hosp., 94 S.W.3d at 537-38. The sole test is not, as DTT would
have it, whether DTT does "commercial" business in Texas and has "salaried" employees
in Texas. As DTT explains, it does no "commercial" business anywhere; its "business"
is to service its member firms. Under Texas law, the 100% seconded employees are
considered employees, though borrowed, of DTT. Id. A foreign association that sets up
what is, in effect, a permanent office in Texas, and uses this base for conducting out-of-state or global business, could reasonably anticipate a Texas court may exercise general
jurisdiction over the firm. Though Texas is not DTT's headquarters, DTT's contacts with
Texas are substantial; that is, they are comparable to the activities of a resident business
using Texas as a base of operations. 

 In Perkins v. Benguet Consolidated Mining Co., 342 U.S. 437, 72 S.Ct. 413, 96
L.Ed. 485 (1952), a foreign corporation temporarily carried on in Ohio a continuous and
systematic, but limited, part of the general business. Id., 342 U.S. at 438. The cause of
action asserted in Perkins did not arise out of the corporations's activities in Ohio. Id. at
446-47. The company's mining properties were located in the Philippine Islands, and its
operations there were completely halted during the Japanese occupation of the islands
during World War II. Id. at 447. The company's president, who was also the general
manager and principal stockholder, returned to his Ohio home. Id. "There he maintained
an office in which he conducted his personal affairs and did many things on behalf of the
company." Id. at 447-48. He kept company files there. Id. at 448. He carried on
correspondence relating to the company's business and to company employees, and
distributed salary checks to himself as president and to two company secretaries who
worked there with him. Id. He maintained two bank accounts containing substantial
balances of company funds. Id. Several directors' meetings were held there. Id. From
his Ohio office, he also supervised policies dealing with the company's rehabilitation of
the Philippine properties and sent funds to buy equipment for the reconstruction. Id. 

 The Supreme Court held "he carried on in Ohio a continuous and systematic 
supervision of the necessarily limited wartime activities of the company." Id. Although
the corporation did not own or operate any mining properties in Ohio, many of its wartime
activities were directed from Ohio and were given the personal attention of its president
in Ohio. Id. The Supreme Court found these were minimum contacts sufficient for the
exercise of general jurisdiction by a court in Ohio should the Ohio court choose to assert
jurisdiction. Id.

 In American Type Culture Collection, the Texas Supreme Court considered whether 
a Texas court had general jurisdiction over a foreign corporation organized under District
of Columbia laws with its principal place of business in Maryland. American Type Culture
Collection, 83 S.W.3d at 807. The corporation advertised in national and international
journals, sold products to Texas residents for at least eighteen years, served as a repository
for Texas researchers, contracted with a Texas medical center, and signed a repository
contract in Maryland. Id. at 807-08. All of the services related to the repository contract
were performed in Maryland. Id. The corporation also purchased approximately
$378,000 of supplies from thirty-three Texas vendors, and the corporation's
representatives attended five conferences in Texas. Id. at 808. Unquestionably, there
were contacts with Texas, but there was no pattern of continuing systematic activity. Id.
at 809. Relying on CSR Ltd., 925 S.W.2d at 595, the Texas Supreme Court focused on
the fact that the corporation had no physical presence or office in Texas, did not advertise
in Texas, performed all of its business services outside Texas, and carefully constructed
its contracts to ensure it did not benefit from Texas laws. American Type Culture
Collection, 83 S.W.3d at 810. The Supreme Court found the corporation did not have
sufficient minimum contacts with Texas. Id. 

 This case is distinguishable from American Type Culture Collection and more
closely resembles Perkins. DTT has a physical presence in Texas, and staffs its borrowed
office with a partner and employees seconded to DTT. As the managing partner for the
Latin American region who gives advice to member regional firms, and as the seconded
partner assisting the member firms globally, Ben Anderson uses Texas as his base of DTT
operations. Julie Marshall functions for DTT as a facilitator for training programs, and
she does so out of the Houston office. Various faxes and e-mails in the record demonstrate
her planning and communication from the Houston office on the field service training
programs. 

 We focus on the nature and quality of DTT's contacts. See American Type Culture
Collection, 83 S.W.3d at 806. DTT has a physical presence in Texas. In describing the
Houston office, Anderson stated as follows:


 What would happen, would be at the end of the year, the employees
or the partner on secondment, which would be me, there would be a
reimbursement to . . . the U.S. firm for my time. So nothing would
go to the Houston office as a result of reimbursing for my time. I'm
not part of the Houston office at all. I do have an office in Houston. 
So what they do, is they allocate a certain percent of the office space,
based on actual cost, and they reimburse it at year end. 



 . . . . 


 For me and the one, two, or three or four people that are in Houston,
that are employees.


 Q. All right. And you said you do have an office in Houston?


 A. Yes, I do. 


In an affidavit filed after his deposition, Anderson made clear he and four employees in
the Houston office are seconded to DTT. 

 Contrary to DTT's assertion, DTT's physical presence and contacts in Texas are
not haphazard, sporadic, tenuous, isolated, or fortuitous, such that DTT could not have
reasonably anticipated being haled into a Texas court. Regardless of whether the office
could have been located in some other state or country, or was originally intended as a
permanent presence, it is apparent from the record that DTT has maintained an office in
Texas for over ten years and has staffed it with seconded employees working for DTT and
using Texas as a base for DTT's work. 

 Appellants rely on the holding in Gutierrez that a Texas court did not have personal
jurisdiction over DTT. Gutierrez, 100 S.W.3d at 270. The Gutierrez plaintiffs argued the
Texas trial court had specific jurisdiction over DTT, because it "acted as a conduit" for
activities in Texas. Id. at 268. On that record, the Gutierrez court found that, aside from
maintaining a website and lending its name to multiple accounting firms, DTT had no
relationship to the transactions in that case. Id. DTT performed none of the work, had
no interaction with the party for whom the audit was conducted, and did not perform any
services for DT-Texas or DT-Cayman in connection with the audit. Id. 

 Gutierrez is not a general jurisdiction case. The record here establishes DTT has
an actual physical presence in Texas through a Texas office and through the conduct of
DTT's business by the seconded employees in Texas. The Gutierrez court made no
mention of DTT seconded employees doing their work out of a Texas office ultimately
paid for by DTT, and the record in that case may not have included this information. See
id.

 Appellants also rely on Alenia Spazio, S.P.A. v. Reid, 130 S.W.3d 201 (Tex. App.--Houston [14th Dist.] 2003, pet. filed). Reid, a Canadian citizen, filed suit in Texas against
several defendants, including two Italian companies organized under the laws of Italy and
headquartered in Rome. Id. at 206. Alenia, one of the Italian companies, had contracts
relating to the Space Station Project with the Italian Space Administration, the European
Space Administration, and a German space agency. Id. at 218. "NASA, rather than the
Italian Companies, decided that some of Alenia's services under the contracts with three
European entities would be performed at the Space Center." Id. The Italian companies
had an office and employees at the Space Center in Houston for four years. Id. at 216-217. Over one hundred employees of the Italian company traveled to the Space Center in
connection with the Space Station project. Id. at 216. Numerous communications were
directed to individuals at the Space Center in connection with the project, and on at least
two occasions, one of the Italian companies sent a shipment from Italy to the Space Center. 
Id. The Alenia court noted that simply "having an office in the forum state does not 
require a finding of general jurisdiction." Id. at 217. The significance of the contact
depends on the "type and nature" of the office maintained in Texas. Id. Nothing in the
record suggested the Italian companies made any efforts to exploit Texas markets. Id. 
They had no bank accounts or listings in any public telephone dirrectory in Texas, had not
paid taxes or franchise fees in Texas, did not regularly advertise in Texas, and had no
authorized agents to accept service of process in Texas. Id. 

 The facts in Alenia are distinguishable from those here. The DTT office is not a
temporary presence. It is not the unilateral result of some other company's decision. In
Alenia, the court stated, "If a defendant maintains a permanent general business office
through which it solicits business in Texas, then this factor tends to weigh strongly in favor
of general jurisdiction." Id. at 217. DTT does not "solicit" commercial business in
Texas, or anywhere, because that is not its function. DTT's purpose is to service its
members, and it receives a small percentage of each member's net revenues as a
subscription fee to permit it to do so. A limited part of its business activity is conducted
continually and systematically from a Texas base of operations, and is of such a substantial
nature and quality as to justify suit against DTT here. We hold the record here
demonstrates sufficient minimum contacts to support general jurisdiction over DTT in
Texas. 

Fair Play and Substantial Justice
 

 We must next consider whether the exercise of jurisdiction over DTNA and DTT
by a Texas court would nevertheless offend traditional notions of fair play and substantial
justice. Guardian Royal Exch., 815 S.W.2d 228-33. In the context of a dispute involving
a foreign defendant, four factors are relevant: (1) the unique burdens placed on a defendant
that must defend itself in a foreign legal system; (2) the interests of the forum state in
adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and efficient
relief; and (4) the procedural and substantive policies of other nations whose interests are
affected as well as the federal government's interest in the policies. Id. "Only in rare
cases . . . will the exercise of jurisdiction not comport with fair play and substantial justice
when the nonresident defendant has purposefully established minimum contacts with the
forum state." Id. at 231; see, e.g., State of Rio de Janeiro of The Federative Republic of
Brazil v. Philip Morris, Inc., 143 S.W.3d 497, 500-04 (Tex. App.-- Beaumont 2004, pet.
denied). 

 Appellants argue that having to litigate far from home is burdensome and would
entail the gathering of evidence in Mexico, as well as proof of Mexican law. The burden
of defending this case is not unique to Texas; the same evidence gathering burden would
exist if plaintiffs sued in Switzerland, New York, or the Netherlands Antilles. Moreover,
DTNA sent its representatives to Texas for each of three accounting years to evaluate and
audit the accounting functions performed in Texas by Texas companies. Witnesses
regarding the Texas portion of the audit would most likely be located in Texas. As to
DTT, it is a global association with individual firm members located around the world, and
it has representatives and an office in Texas. In view of this physical presence in Texas,
litigating here would not be unduly burdensome or unique.

 Appellants argue Texas has no interest in providing a forum for the claims. 
However, the plaintiffs' pleadings allege appellants were involved in misconduct
concerning audits of a company with a substantial base of operations in Texas. The
evidence shows DTNA's work was conducted at least in part in Texas, and DTT has a
place of operations in Texas. As the San Antonio court explained in Gutierrez, "Texas has
a strong interest in assuring the integrity of investment firms that choose to operate in the
state, and we cannot permit this state to be used as a base of operations by corporations
seeking shelter from our securities laws or from lawsuits." Gutierrez, 100 S.W.3d at 274. 
Likewise, Texas has an interest in the trustworthiness of the audit work performed in part
in Texas for diversified firms operating in Texas. 

 The plaintiffs themselves have an interest in adjudicating their claims in Texas. The
InterAmericas Group, the entity at the hub of the causes of action, and most of the
individual defendants, are located in Texas. The plaintiffs' accounts were managed by and
through InterAmericas' personnel located in Texas. Appellants conducted activities in
Texas -- one as part of a specific project and the other on an ongoing basis. 

 Under the fourth prong, appellants argue that requiring DTNA to answer claims in
Texas would offend the sovereign interest of the Netherlands Antilles. See Guardian
Royal Exch., 815 S.W.2d at 228-29. Given DTNA's purposeful business contacts with
Texas and the interest of Texas in assuring the integrity of investment firms operating in
Texas, we fail to see on this record how comity concerns are implicated. 

 We hold the trial court's exercise of jurisdiction comports with traditional notions
of fair play and substantial justice. We affirm the trial court's ruling as to its jurisdiction
over DTNA and DTT. The stay order issued by this Court is vacated.

 AFFIRMED. 
_________________________________

 DAVID GAULTNEY

 Justice

Submitted on April 7, 2005

Opinion Delivered August 25, 2005

Before McKeithen, C.J., Gaultney and Kreger, J.J.
1. But see Michiana, 2005 Tex. LEXIS 420, at *33 (Personal jurisdiction is based on
a defendant's contacts with the State, not where defendant "directed a tort.").
2. GAAP refers to Generally Accepted Accounting Principles; GAAS refers to
Generally Accepted Auditing Standards.
3. Ben Anderson describes his length of secondment as follows:


 "I was first seconded from the U.S. firm to DTT in about 1992, 1993. I
worked there continuously until 2003. At that time I became 100 percent
back into U.S. firm. And then starting in 2004, I believe it was sometime
in 2004, the dates aren't exact, I came back into DTT. So I was only out
one year. Since '92-93. So it's been ten-plus years."