Opinion issued August 28, 2008











In The

Court of Appeals

For The

First District of Texas






NO. 01-07-00972-CV






JOSEPH MONTEROSSO AND LUIS VARGAS, Appellants


V.


MARK VANCE, Appellee






On Appeal from the 190th District Court

Harris County, Texas

Trial Court Cause No. 05-78287






MEMORANDUM OPINION

 Appellants, Joseph Monterosso and Luis Vargas, appeal the denial of their
special appearance. See Tex. Civ. Prac. & Rem. Code Ann § 51.014(a)(7) (Vernon
2008). We affirm.

BACKGROUND


TXCI Acquires CNS

 This case stems from the purchase of Control Network Systems ("CNS"), a
Texas corporation, by TotalAxcess ("TXCI"), a Delaware corporation headquartered
in California. Mark Vance, appellee, and Steve Garvin founded CNS, an
international telecommunications company, in 1998. (1) TXCI was also a
telecommunications company. Monterosso, a California resident at the time, (2) was the
CEO and President of TXCI; Vargas, also a California resident, was an accountant
for TXCI.

 In 2001, TXCI expressed interest in purchasing CNS. Garvin and Vance were
not getting along, and, although there was money in the bank, CNS was not
profitable. Believing that TXCI could make CNS profitable, on December 1, 2001,
TXCI bought CNS for $1.00 (one dollar) and promises to (1) repay $600,000 that
Vance and his father had loaned CNS and (2) pay off auto loans for Vance and
Garvin. The Vance loans were to be repaid in installments beginning in January
2002. A December 15, 2001 letter from Monterosso to Vance confirmed Vance's
security interest in CNS/TXCI accounts receivable.

 Both Vargas and Monterosso came to Texas to finalize the purchase agreement. 
Garvin testified that Monterosso came to Texas at least twice while negotiating the
purchase of CNS and that Vargas came once. Vance testified that Vargas was "not
just a bookkeeper," describing him as "the other partner in the business," and
instrumental in making the deal. Vance testified that before, during, and after the
December 15 closing, Vargas told him, "We will make the payments in the
agreement." Vance also testified that in multiple conversations and emails, Vargas
promised to deliver to Vance a UCC-1, (3) but he never did. Garvin said he spoke to
Vargas at least twice a day after TXCI bought CNS. Vance said he spoke to
Monterosso twenty or thirty times after the sale to discuss ways Vance might be able
to help CNS prosper.

Corporate Officers and Directors

 After the sale, Monterosso, acting as President and CEO of TXCI, the sole
owner of CNS, appointed himself, Vargas, Garvin, (4) and two others to the CNS board
of directors. Although Monterosso agreed that it was his signature on the "Action by
Written Consent of the Sole Shareholder of CNS," which appointed the new CNS
board of directors, Monterosso denied ever having served as a director for CNS. In
fact, he stated that no board meetings for CNS were ever held. However, Monterosso
also testified that he was the chairman of the board of CNS.

 In support of his jurisdictional claims, Vance offered unsigned letters and
emails to customers in which Vargas represented himself as the CFO, Chief Financial
Officer, or COO of CNS. However, both Monterosso and Vargas disputed that
Vargas was a corporate officer or director for CNS. Monterosso said that there were
no corporate records showing that Vargas ever accepted a position as corporate
officer. Monterosso testified that Vargas used the term CFO only to indicate that he
was doing accounting work for CNS. In addition, Monterosso stated that Vargas
never acted as a director of CNS and that Vargas worked in California. By affidavit,
Vargas also denied having served as a director or corporate officer of TXCI or CNS. (5)
 

 Furthermore, Vargas denied signing and sending the unsigned letters that
Vance offered to show that he had designated himself as CFO or COO. Vargas
testified that he had never seen or approved the "Control Network System Carrier
Support Escalation Referral List," which he described as an internal document that
showed Vargas as the CFO, with a Houston, Texas address.

 Monterosso signed at least one document as the President of CNS. However,
Monterosso testified Garvin was the president and CEO of CNS from the date of the
purchase until Garvin resigned on August 1, 2002.

Breach of the December 2001 Contract

 CNS/TXCI did not pay Vance in accordance with their agreement. On July 22,
2002, Vance's attorney sent a demand letter to Monterosso stating that CNS and
TXCI were in default. Vance's attorney contacted CNS customers, informed them
that Vance held a security interest in CNS accounts receivable, and directed them to
pay Vance directly, instead of paying CNS. On July 24, 2002, Vargas and Garvin
sent letters to their customers denying that Vance held a valid security interest in CNS
accounts receivable. Garvin testified that this was a "false statement." According to
Garvin, many CNS customers stopped paying.



The July 2002 Agreement

 Anxious for its customers to resume paying, Monterosso executed an
"Indemnity and Hold Harmless Agreement" promising to indemnify one of CNS's
customers against any action by Vance. Monterosso signed this agreement,
"personally, and as the President of [TXCI] and President of [CNS]." In addition,
Monterosso and Vance entered into a letter agreement, dated July 26, 2002, which
affirmed CNS's obligation to Vance and modified the timeline for repayment. But
Monterosso denied negotiating this agreement, stating that Garvin "would have been
the only one to do this." Vance notified CNS's customers of the agreement and
instructed them to pay CNS directly.

 While Vargas conceded that he had six telephone calls with Vance after the
December 2001 sale, he categorically denied any involvement in the July 2002
agreement, "I had no involvement whatsoever with that agreement and I did not have
any discussions by telephone or otherwise with Mr. Vance in connection with that
agreement. Thus, since I didn't speak to Mr. Vance, I gave him no promises or
assurance that the payments would be made, nor did I make any representations to
him that any of the payments would be made that are discussed in that letter
agreement." (Emphasis original).

 According to Garvin, within days of this agreement, Monterosso asked him to
leave his employment with CNS to run Signature Communications, a competing
business wholly owned by Monterosso. Garvin testified that Monterosso wanted him
to take all of CNS's assets, customers, and vendors and establish Signature
Communications in a new office. Garvin testified that Monterosso wanted it to
appear as if Garvin owned Signature. Garvin said that Monterosso told him he
wanted to do this because "I want to screw Mark [Vance] and make sure he doesn't
get a penny." After consulting with an attorney, Garvin resigned on August 1, 2002.

 Monterosso testified that due to Vance's attempt to exercise his security
interest, customers stopped paying, and in August 2002, TXCI realized that CNS
would not survive. Monterosso testified that to preserve valuable customer
relationships, CNS customers were offered the option of doing business with
Signature Communications instead of CNS, and some customers accepted. 

Breach of the July 2002 Agreement

 CNS/TXCI failed to pay in accordance with the terms of the July 2002
agreement, and Vance sued for breach of contract, fraud, misrepresentation, breach
of fiduciary duty, violation of the Deceptive Trade Practices Act, and conspiracy. At
the heart of his claims is Vance's allegation that Monterosso and Vargas came to
Texas and falsely assured him that CNS or CNS and TXCI would pay him in
accordance with their agreements. 

Special Appearances

 Monterosso and Vargas filed special appearances, and each attached an
affidavit. Monterosso testified by affidavit that: (1) he never lived or resided in
Texas; (2) he did not engage in any business in Texas, except as a duly authorized
representative of a company he worked for; (3) he visited Texas twice on behalf of
companies he worked for, for no more than 5 days, total; (4) he has had a limited
number of phone calls with Texas residents, and all on behalf of a company he
worked for; (5) he personally met with Vance only twice, and spoke with him no
more than six times in three years. In addition, Monterosso denied having committed
fraud in Texas and denied owing Vance a fiduciary duty. 

 Likewise, Vargas testified that: (1) he never lived or resided in Texas; (2) he
owned no property in Texas; (3) he was never a party to a contract to be performed
in whole or in part within the State of Texas; (4) except as a duly authorized
representative of a company for which he worked, he did not engage in any business
in Texas; (5) on behalf of companies for which he worked, he visited Texas once for
one day; (6) he has had a limited number of phone calls with Texas residents, and all
on behalf of a company for which he worked; (7) he personally met with Vance only
once, and spoke with him by telephone no more than three times in November and
December 2001. In addition, Vargas denied having committed fraud in Texas and
denied owing Vance a fiduciary duty. Finally, Vargas testified that he did accounting
for TXCI and for CNS, solely because CNS was a subsidiary of TXCI, and many
accounting functions, like accounts receivables, were combined.

The Appeal

 After a hearing, the trial court denied appellants' special appearances. 
Monterosso and Vargas appeal, arguing that: (1) Vance failed to establish with
adequate specificity allegations sufficient to bring them under the Texas long-arm
statute; (2) the fiduciary shield applies because all of their actions were on behalf of
TXCI; and (3) the evidence was legally and factually insufficient to support the trial
court's order.Standard of Review

 The existence of personal jurisdiction is a question of law reviewed de novo
by this Court. BMC Software Belgium, N.V. v. Marchand, 83 S.W.3d 789, 794
(Tex. 2002). However, this question must sometimes be preceded by resolving
underlying factual disputes. Id. When, as here, the trial court does not issue fact
findings, we presume that the trial court resolved all factual disputes in favor of its
ruling. Am. Type Culture Collection, Inc. v. Coleman, 83 S.W.3d 801, 806
(Tex. 2002).Personal Jurisdiction

 "Texas courts may assert personal jurisdiction over a nonresident defendant
only if the Texas long-arm statute authorizes jurisdiction and the exercise of
jurisdiction is consistent with federal and state due process standards." Id. (citing
Guardian Royal Exch. Assur. Ltd. v. English China Clays, P.L.C., 815 S.W.2d 223,
226 (Tex. 1991); see Tex. Civ. Prac. & Rem. Code Ann. §§ 17.041-045 (Vernon
2008) (Texas's long-arm statute). The long-arm statute allows Texas courts to
exercise jurisdiction over a nonresident defendant that "does business" in the state. 
Tex. Civ. Prac. & Rem. Code Ann. § 17.042 (Vernon 2008). 

 In addition to other acts that may constitute doing business, a
nonresident does business in this state if the nonresident:


 (1) contracts by mail or otherwise with a Texas resident and either
party is to perform the contract in whole or in part in this state;


 (2) commits a tort in whole or in part in this state; or


 (3) recruits Texas residents, directly or through an intermediary
located in this state, for employment inside or outside this state.

Id.

 This list, however, is not exhaustive. BMC Software, 83 S.W.3d at 795. The
Texas Supreme Court has held that "section 17.042's broad language extends Texas
courts' personal jurisdiction as far as the federal constitutional requirements of due
process will permit." Id. (citation omitted).

 Initially, the plaintiff bears the burden of pleading allegations sufficient to
bring a nonresident defendant within the terms of the Texas long-arm statute. Am.
Type Culture Collection, 83 S.W.3d at 807. However, when a nonresident defendant
files a special appearance, that defendant assumes the burden of negating all bases of
personal jurisdiction that the plaintiff has alleged. Id.

 Personal jurisdiction over nonresident defendants is constitutional when two
conditions are met: (1) the defendant has established minimum contacts with the
forum state and (2) the exercise of jurisdiction comports with traditional notions of
fair play and substantial justice. Id. at 806 (citing Int'l Shoe Co. v. Washington,
326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945)). A nonresident defendant's minimum
contacts must derive from purposeful availment: a nonresident defendant must have
"purposefully availed" itself of the privileges and benefits of conducting business in
the foreign jurisdiction to establish sufficient contacts with the forum to confer
personal jurisdiction. Id. (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462,
474-76, 105 S. Ct. 2174, 2183-84 (1985)); Xenos Yuen v. Fisher, 227 S.W.3d 193,
200 (Tex. App.--Houston [1st Dist.] 2007, no pet.). An act or acts "by which the
defendant purposefully avails itself of the privilege of conducting activities" in Texas
and "thus invok[es] the benefits and protections" of Texas law, constitutes sufficient
contact with Texas to confer personal jurisdiction. Michiana Easy Livin' Country,
Inc. v. Holten, 168 S.W.3d 777, 784 (Tex. 2005) (emphasis in original) (quoting
Hanson v. Denckla, 357 U.S. 235, 253, 78 S. Ct. 1228, 1240 (1958)).

 We consider three elements of purposeful availment. See Michiana Easy Livin'
Country, 168 S.W.3d at 785; see First Oil PLC v. ATP Oil & Gas Corp., No. 01-07-00703-CV, 2008 WL 2186781, *12 (Tex. App.--Houston [1st Dist.] May 22, 2008,
no pet.). First, we consider only the defendant's own actions, not those of the
plaintiff or any other third party. Michiana Easy Livin' Country, 168 S.W.3d at 785;
First Oil PLC, 2008 WL 2186781 at *12; see also U-Anchor Adver., Inc. v. Burt, 553
S.W.2d 760, 762-63 (Tex. 1977).

 Second, the activities must be purposeful, not random, isolated, or fortuitous. 
Michiana Easy Livin' Country, 168 S.W.3d at 785; First Oil PLC, 2008 WL 2186781
at *12. "It is the quality, rather than the quantity of the contacts that is
determinative." First Oil PLC, 2008 WL 2186781 at *12 (emphasis original). Third,
the defendant must seek some benefit, advantage, or profit by virtue of its activities
in the proposed forum state, because this element is based on the notion of implied
consent. Michiana Easy Livin' Country, 168 S.W.3d at 785; First Oil PLC, 2008 WL
2186781, at *12. 

 Our jurisdictional analysis is further divided into general and specific personal
jurisdiction. CSR, Ltd. v. Link, 925 S.W.2d 591, 595 (Tex. 1996). General
jurisdiction will attach when "a defendant's contacts are continuous and systematic,
permitting the forum to exercise personal jurisdiction over the defendant even if the
cause of action did not arise from or relate to activities conducted within the forum
state.." Id. To support general jurisdiction, the defendant's forum activities must
have been "substantial," which requires stronger evidence of contacts than for
specific personal jurisdiction. Preussag Aktiengesellschaft v. Coleman, 16 S.W.3d
110, 114 (Tex. App.--Houston [1st Dist.] 2000, pet. denied). General jurisdiction is
premised on the nonresident having consented to jurisdiction through its continuous
contact invoking the benefits and protections of Texas. Am. Type Culture Collection,
83 S.W.3d at 808. This analysis focuses on the nature and quality of the contacts, as
opposed to the quantity. Id. at 810. 

 Specific jurisdiction lies when the defendant's alleged liability arises from or
is related to an activity conducted within the forum. BMC Software, 83 S.W.3d at
796. "For a nonresident defendant's forum contacts to support an exercise of specific
jurisdiction, there must be a substantial connection between those contacts and the
operative facts of the litigation." Moki Mac River Expeditions v. Drugg, 221 S.W.3d
569, 585 (Tex. 2007). This requirement assesses "the strength of the necessary
connection between the defendant, the forum, and the litigation." Id. at 584.

Adequate Specificity of Jurisdictional Allegations

 Monterosso and Vargas contend that Vance failed to plead a sufficient basis
for subjecting them to personal jurisdiction, and therefore, the trial court's denial of
their special appearances should be reversed. The plaintiff's original pleadings as
well as its response to the defendant's special appearance can be considered in
determining whether the plaintiff satisfied its burden. Wright v. Sage Eng'g, Inc., 137
S.W.3d 238, 249 n.7 (Tex. App.--Houston [1st Dist.] 2004, pet. denied). Rule 120a
also states that, in determining whether the special appearance should be granted or
denied, courts may consider evidence from "the pleadings, any stipulations made by
and between the parties, such affidavits and attachments as may be filed by the
parties, the results of discovery processes, and any oral testimony." Tex. R. Civ. P.
120a(3); see also Gutierrez v. Deloitte & Touche, 100 S.W.3d 261, 273
(Tex. App.--San Antonio 2002, pet. dism'd).

 In his original petition, Vance alleged that Monterosso and Vargas had
sufficient minimum contacts with Texas to bring them under the Texas long-arm
statute and that all or part of the cause of action arose in Texas. In his response to
their special appearances, Vance alleged that: (1) general jurisdiction exists as to
Vargas, who served as the CFO of CNS, a Texas corporation; (2) Vargas signed
documents on behalf of CNS, a Texas corporation, from a Houston address; (3)
Monterosso and Vargas both served on the board of directors of CNS, a Texas
corporation; (4) while in Dallas, Texas, Monterosso executed an indemnity agreement
individually and as president of CNS, a Texas corporation; (5) Monterosso came to
Texas at least twice while negotiating the acquisition of CNS; (6) Monterosso spoke
to Garvin at least twice a day while Garvin worked for CNS, after the acquisition; (7)
Monterosso was an officer and director of CNS; (8) Monterosso and Vargas came to
Texas in December 2001 to finalize the sale of CNS; (9) Monterosso spoke with
Vance at least twenty times by telephone; (10) Monterosso and Vargas negotiated the
second agreement with Vance; (11) Vargas spoke to Vance by telephone up to 40
times; (12) Vargas promised, in conversations and in writing to Vance, a UCC-1 to
evidence his security interest in the accounts receivable; and (13) Vargas promised,
on behalf of CNS, to have Vance's car paid off. We conclude Vance satisfied his
burden of pleading. See Ennis v. Loiseau, 164 S.W.3d 698, 705 (Tex. App.--Austin
2005, no pet.). 

 We overrule this issue. 



Long Arm Statute

 We begin our jurisdictional analysis by noting that Vance alleged that both
Monterosso and Vargas committed torts--fraud, misrepresentation, conspiracy,
breach of fiduciary duty--at least in part in Texas. He also provided some evidence
that Monterosso and Vargas made false representations to him while in Texas. While
this is sufficient to satisfy the Texas long-arm statute, it does not end our analysis;
rather, we must also determine whether the exercise of jurisdiction would comport
with due process. See Tex. Civ. Prac. & Rem. Code Ann. § 17.042(2); see also
Am. Type Culture Collection, 83 S.W.3d at 806. 

Fiduciary Shield Doctrine Monterosso and Vargas argue that because all of their actions in Texas were
on behalf of TXCI, they are not subject to personal jurisdiction. The fiduciary shield
doctrine holds that an employee of a company is protected from personal jurisdiction
when the employee's actions have been taken on behalf of his employer. Garner v.
Furmanite Australia Pty., Ltd., 966 S.W.2d 798, 803 (Tex. App.--Houston [1st Dist.]
1998, pet. denied). However, Texas courts applying the "fiduciary shield doctrine
have expressly limited its application to attempts to exercise general jurisdiction over
a nonresident defendant." Wright, 137 S.W.3d at 250; see also SITQ E.U., Inc. v.
Reata Rests., Inc., 111 S.W.3d 638, 650-51 (Tex. App.--Fort Worth 2003, pet.
denied). The fiduciary shield doctrine does not protect a corporate officer or agent
from specific personal jurisdiction as to intentional torts or fraudulent acts for which
he may be individually liable. Wright, 137 S.W.3d at 250; see also Gen. Elec. Co. v.
Brown & Ross Int'l Distribs., Inc., 804 S.W.2d 527, 532-33 (Tex. App.--Houston
[1st Dist.] 1990, writ denied) (holding that corporate officers who had, inter alia,
made misrepresentations to customers were subject to personal jurisdiction in Texas). 
A corporate agent can be held individually liable for fraudulent statements or
knowing misrepresentations even when the agent makes them in his capacity as a
corporate representative. Wright, 137 S.W.3d at 250. The causes of action asserted
by Vance against Monterosso and Vargas individually, which are based on their
alleged misrepresentations, are claims for which they could be held individually
liable. See id. Therefore, the fiduciary shield doctrine is not available to Monterosso
and Vargas as a defense to the trial court's exercise of specific personal jurisdiction
based on their alleged misrepresentations. Id. at 251; see D.H. Blair Inv. Banking
Corp. v. Reardon, 97 S.W.3d 269, 278 (Tex. App.--Houston [14th Dist.] 2002, pet.
dism'd w.o.j.) (refusing to apply fiduciary shield doctrine to protect defendant from
personal jurisdiction based on alleged misrepresentations that were directed into
Texas and foreseeably relied on in Texas, despite defendant's claim that he acted only
in corporate capacity). 

 It "is 'the defendant's conduct and connection with the forum' that are critical."
Michiana Easy Livin' Country, 168 S.W.3d at 789 (citing Burger King, 471 U.S. at
474, 105 S. Ct. at 2183 (1985)). To determine such, we need only ascertain whether
there is "more than a scintilla" of evidence to support the trial court's finding that
Monterosso and Vargas performed individual acts that allow for specific jurisdiction. 
BMC Software, 83 S.W.3d at 795-96. 

 As we noted earlier, the trial court did not issue findings of fact, so we must
presume that the trial court resolved all factual disputes in favor of its ruling. Am.
Type Culture Collection, 83 S.W.3d at 806. With that guiding principle in mind, we
now examine whether sufficient evidence supporting the trial court's ruling existed
in the record. (6)

Monterosso

 Monterosso approached CNS about TXCI's purchase of CNS. Monterosso
appointed himself to the board of directors of CNS, and he held himself out as the
president of CNS, a Texas corporation. He personally indemnified one of CNS's
customers in a document signed in Texas. In addition, Monterosso came to Texas to
negotiate and finalize the purchase of CNS, and he had regular communications with
Garvin, a Texas employee of CNS between December 2001 and July 2002. 
According to Garvin, Monterosso also instructed Garvin to strip the assets from CNS
to deprive Vance of the benefit of his bargain. We conclude that sufficient evidence
exists in the record to show that Monterosso purposefully availed himself of the
privileges of conducting business in Texas. 

 In addition, there is a substantial connection between these contacts and the
operative facts of the litigation. See Moki Mac River Expeditions, 221 S.W.3d at 585. 
Vance alleges fraud, misrepresentation, conspiracy, and his other causes of action
based on actions and representations made by Monterosso in the initial negotiations
and when he served as an officer and director of CNS. The evidence at trial will
necessarily include testimony and documentary evidence regarding the sale, Vance's
attempted enforcement of his security interest, and appellants' efforts to dissuade him
from collecting on his security interest. 

 Finally, there is nothing in the record to show that having to defend the suit in
Texas would be excessively burdensome to Monterosso, so we conclude that the
exercise of specific, personal jurisdiction as to Monterosso will not offend traditional
notions of fair play and substantial justice.

 We conclude that specific, personal jurisdiction exists as to Monterosso, and
we hold that the court properly denied Monterosso's special appearance.

Vargas

 Vargas also traveled to Texas to review the books of CNS and to finalize the
sale. In email communications, he held himself out to be the CFO of CNS, and he
signed documents on behalf of CNS using a Houston, Texas address. He had regular
communications with a Texas employee of CNS and with Vance. He made
representations to Vance that he would provide a UCC-1 and ensure that Vance's
auto loan was paid off. According to Vance, Vargas negotiated the second agreement
with Vance. We conclude that sufficient evidence exists in the record to show that
Vargas purposefully availed himself of the privileges of conducting business in
Texas. 

 In addition, there is a substantial connection between these contacts and the
operative facts of the litigation. See id. Vance alleges fraud, misrepresentation,
conspiracy, and his other causes of action based on actions and representations made
by Vargas in the initial negotiations and subsequent negotiations. The evidence at
trial will necessarily include testimony and documentary evidence regarding the sale,
Vance's attempted enforcement of his security interest, and appellants' efforts to
dissuade him from collecting on his security interest. 

 Finally, there is nothing in the record to show that having to defend the suit in
Texas would be excessively burdensome to Vargas, so we conclude that the exercise
of specific, personal jurisdiction as to Vargas will not offend traditional notions of
fair play and substantial justice.

 We conclude that specific, personal jurisdiction exists as to Vargas, and we
hold that the court properly denied Vargas's special appearance. General Jurisdiction

 Because we find that specific, personal jurisdiction exists as to both
Monterosso and Vargas, we need not consider whether general, personal jurisdiction
exists as to them.

 We overrule appellants' remaining issues.Conclusion

 We affirm the order of the trial court.




 Sam Nuchia

 Justice


Panel consists of Justices Nuchia, Alcala, and Hanks.


1. According to Garvin, CNS "built network within [different countries and] . . . sold it to
carriers within the United States." Vance and Garvin were the sole shareholders.
2. Monterosso has since moved to Florida.
3. The "UCC-1" is a financing statement under the Uniform Commercial Code, which
evidences the lien. See Tex. Bus. & Com. Code Ann. 9.501-.527 (Vernon 2002 & Supp. 2008).
4. Garvin continued to work for CNS after the sale.
5. "I was at all times only an employee of TXCI. I never had any authority to act or do
anything with respect to TXCI or CNS, other than to perform the day-to-day
accounting work of those companies. I was never aware of any document that
purported to appoint me as a director of CNS, and I never agreed to serve as a
director of CNS. Nor did I ever serve as a director of CNS. At no time did I ever
attend any board meeting of CNS or otherwise take any action or purport to take any
action as a director of CNS.


 With respect to the two emails offered by Mr. Vance's counsel that referred to me as
a "CFO" of CNS, that designation only meant that I was the chief accountant
working for the companies, and was the person ultimately responsible for the
financial records of both the companies. However, I did not intend to convey that I
had, nor did I ever have, any authority to act on behalf of TXCI or CNS, other than
my performance of the day-today accounting work. Nor did I intend to convey that
I had been appointed as a corporate officer or director of either company."

6. Monterosso and Vargas objected to Vance's evidence in the trial court, but the record does
not show that the trial court ruled on these objections. Therefore, we will examine the entire record. 
See Tex. R. App. P. 33.1(a)(2)(A) (preservation of error); see also Gen. Elec. Co. v. Brown & Ross
Int'l Distribs., Inc., 804 S.W.2d 527, 534 (Tex. App.--Houston [1st Dist.]1990, writ denied) ("The
appropriate standard of review in the appeal of a special appearance case is to review all the evidence
in the record.")